CHROMIUM INDUSTRIES,
INC., Plaintiff,

v.

MIRROR POLISHING & PLATING CO.,
INC., Plasma Coatings Inc., and Roll
Grinding Corporation of America, Defendants.

No. 75 C 3131.

United States District Court,
N. D. Illinois, E. D.

March 15, 1978.

Charles A. Laff, Marvin Smollar, Laff, Whitesel & Rockman, Chicago, Ill., for plaintiff.

James Van Santen, John L. Schmitt, Hill, Gross, Simpson, Van Santen, Steadman, Chiara & Simpson, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

MARSHALL, District Judge.

Plaintiff Chromium Industries, Inc. (Chromium), an Illinois corporation with its principal place of business in Illinois, is en-

gaged in the business of applying certain coatings and finishes to roller surfaces which are used in industry for shaping, forming and guiding various materials. One of these coatings consists of applying a fluorocarbon polymer, such as DuPont's Teflon, over a chromium-plated surface. For brevity, we will call this a FPC (fluoro-carbon-polymer-chromium) surface or coating. The finishing process creates a non-stick surface with superior wear and corrosion resistance and excellent release characteristics. The surface can be used on industrial metal rollers to handle paper, plastic and textiles. The right to manufacture and market FPC surfaces forms the basis of Chromium's lawsuit.

In its amended complaint, Chromium asserts four claims against three Connecticut corporations that allegedly compete with Chromium in the market for FPC coatings. All three companies have their principal places of business in Connecticut. Three of Chromium's claims arise under federal patent, antitrust and trademark laws. The fourth arises under Illinois laws of unfair competition. Both federal question and diversity jurisdiction are invoked as well as the specific jurisdictional grants in 28 U.S.C. § 1337 (antitrust), 28 U.S.C. § 1338 (patents) and 15 U.S.C. § 1121 (trademarks). In addition, Chromium relies on 28 U.S.C. § 1338(b) for jurisdiction over its pendent state claim. Section 1338(b) gives federal courts jurisdiction over any unfair competition claim "when joined with a substantial and related claim" under the patent laws.

Count 1 is directed solely at defendant Mirror Polishing and Plating Co., Inc. (Mirror). Mirror, like Chromium, applies coatings to roller surfaces. In 1970, Mirror acquired a patent (No. 3,341,348) covering an invention by C. O. Letendre. The Letendre patent describes a detailed process for creating a FPC surface. Chromium alleges that Mirror has charged it with patent infringement and has threatened its customers with infringement suits, causing them to withdraw their business from Chromium. Chromium seeks injunctive relief, and a judgment declaring that its plating process does not infringe the Letendre patent and

that the patent itself is invalid. On April 30, 1976 we entered a preliminary injunction restraining Mirror from threatening Chromium's customers with infringement suits and from communicating with them regarding the Letendre patent in a manner likely to injure plaintiff's business.

Count 2 of the amended complaint is aimed at defendants Plasma Coatings, Inc. (Plasma) and Roll Grinding Corporation of America (Roll Grinding) as well as Mirror, and charges all three defendants with multiple violations of the antitrust laws. Chromium alleges that Mirror, Plasma and Roll Grinding compete with plaintiff in the industry of applying FPC coatings on rollers and other articles. Count 2 charges that these three defendants have conspired in using an overbroad and unjustifiable construction of their Letendre patent and a related trademark to threaten and intimidate Chromium's customers with patent infringement litigation. As a result, these customers have allegedly been coerced into directing their business away from plaintiff and toward defendants. The alleged cumulative effect of this conduct is that 1) defendants have lessened competition in and monopolized the market for FPC surfaces, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and 2) defendants have raised, stabilized and maintained prices for these goods, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. In addition to extending its patent beyond its proper scope and threatening Chromium's customers, defendants are charged with selling purportedly patented surfaces to these customers with the condition and understanding that the customers shall purchase additional plating and polishing services from defendants. These tying practices allegedly violate Section 3 of the Clayton Act, 15 U.S.C. § 14 and Section 1 of the Sherman Act, 15 U.S.C. § 1.

Count 3 contains a state claim under Illinois statutes and common law against Mirror for wrongful interference with Chromium's business and for unfair methods of competition. Chromium alleges that Mirror ignored direct legal remedies which were

available to enforce its disputed patent rights against Chromium and instead launched a bad faith and pernicious assault against Chromium's business by intimidating its customers with threats of patent litigation.

Finally, Count 4 asserts a claim against Mirror under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) for unfair competition, false designation of origin, and false and misleading advertising. Chromium claims that Mirror has used product designations which falsely portray the scope of Mirror's patent rights, which are not entitled to patent or trademark protection, or which unlawfully duplicate the trademarks of similar goods manufactured by an unrelated company.

To remedy these alleged wrongs, Chromium seeks a combination of declaratory, injunctive and monetary relief, including treble damages, punitive damages, costs and attorneys' fees.

Mirror has answered Counts 1, 2 and 3 of the amended complaint and has counterclaimed against Chromium for patent infringement and malicious prosecution. Mirror has also moved for summary judgment on Counts 2 and 3 and to strike or dismiss Count 4. Plasma and Roll Grinding have moved to quash service of process and to dismiss the entire action as to them for lack of personal jurisdiction, improper venue and failure to state a claim for relief. The motions are supported by numerous affidavits, depositions and exhibits.

### Service of Process and Jurisdiction

The first issue presented by these motions is the adequacy of service of process on Roll Grinding and Plasma. The parties agreed during a hearing that formal service of process upon these defendants would be waived without prejudice to defendants' motions to quash. Thus, no challenge is made to the form of the process or the adequacy of notice. Instead defendants contend that neither has sufficient contacts with Illinois to support in personam jurisdiction. To bolster this claim, defendants have filed affidavits by the principal officers of each corporation.

There appears to be no substantial disagreement over the following facts contained in the affidavits and discovery materials.

Both Plasma and Roll Grinding are Connecticut corporations with their principal places of business in Connecticut. Plasma coats and resurfaces articles with plasma, metallizing and fluorocarbons. It does not have any chrome plating facilities, but does have spray gun equipment for applying fluorocarbon polymers on pre-supplied chrome-plated rolls. Roll Grinding performs outside diameter grinding of cylindrical parts. It only has grinding machines and lathes for tooling these parts and does not apply coatings to rollers or other articles.

Both corporations have a primarily regional business which is largely confined to the eastern seaboard. Roll Grinding has never had an Illinois customer. Plasma has never had an Illinois customer for a FPC surface. They have no office or place of business in Illinois, and have not maintained a telephone listing or trade show here. They have never employed any officers or agents in Illinois. They are not incorporated or registered to do business in Illinois.

To rebut this showing, Chromium has drawn from its depositions of defendants' officers and from exhibits to support its argument that Mirror, Roll Grinding and Plasma form a network of companies which are under common management and control and which have an integrated sales and marketing system that encompasses the Illinois area. In addition, Chromium alleges that some conspiratorial acts of the defendants have impinged upon this state.

The three companies have interlocking officers and overlapping stock ownership. Thomas Nalband is Vice-President of Mirror and Roll Grinding, and is the President of Plasma. In his deposition, he stated that he participated in management decisions at all three corporations. Eugene Nalband, Thomas Nalband's brother, is the President

of Mirror and the Treasurer of Roll Grinding and Plasma. The Nalband brothers own stock in all three corporations, including a ⅔ share in Roll Grinding and a ¼ share in Plasma.

The corporations also patronize each other's businesses and have a somewhat interconnected sales referral system. About 7% of Plasma's total business and less than 50% of Roll Grinding's work is performed for Mirror. Each job is done on quotation and is billed to Mirror on a separate, armslength basis. In his deposition, Eugene Nalband stated that the so-called "easy release" FPC coating, which Mirror claims is within its Letendre patent, is applied by both Plasma and Mirror, with the larger jobs reserved for Mirror. Mirror does not send all its grinding work to Roll Grinding, but patronizes competitive grinders and has grinding equipment of its own. Plasma transacts some business with Roll Grinding, but uses competitive grinding services as well. The three corporations do not directly solicit work for one another. However, when one of the companies receives a business inquiry which is suited to another company's capabilities, referrals are made.

The most important evidence is contained in the deposition of Ronald Delaney. As Mirror's sales manager, Delaney had responsibility for sales in the United States and Canada and travelled throughout these regions. (Delaney Dep. 28, 45) He visited several companies in Illinois to solicit business for Mirror. (48) He distributed Mirror sales material to these customers. (49) In addition to soliciting sales for Mirror, Delaney carried a few brochures describing Plasma's available coatings and left them with some customers. However, there is no evidence these customers were in Illinois. (153) Delaney prepared some of Plasma's sales material himself, even though he was a full-time salaried employee for Mirror at the time. (87) Plasma did not pay Delaney for these services. (88) He was a Plasma shareholder, and engaged in "missionary work" by trying to discover businesses where there was a sales potential for Plasma coatings, but had no responsibility for Plasma's sales operations. (27–28) On sev-

eral occasions, Delaney has obtained business for Roll Grinding as well as Plasma. He recalled that "when I encounter business which Mirror Polishing and Plating will have nothing to do with and it involves just grinding, I will feed it to Roll Grinding, strictly on an offhand basis." (41) Again, there is no indication that these referrals were for Illinois customers. It appears that Delaney never accepted any direct compensation for his sales efforts on behalf of Roll Grinding or Plasma and never was formally employed by them as a sales agent. (30, 39–40, 87–88, 89–90).

Finally, there is some scanty evidence that the corporations may have used the same patents and trademarks and held out a common marketing image. In their affidavits, the officers of Roll Grinding and Plasma state that these companies are not licensed to use the Letendre patent. But Plasma once distributed a now-discontinued reference table of available coatings to about 10 or 15 customers. The table indicated that Plasma provided Mirror's patented FPC surface under a license from Mirror. It also mentioned Mirror's trademark ("easy release") for this process. According to Plasma's Vice-President, Robert Carlo, current literature omits these statements and Plasma only coats fluorocarbons over chrome for Mirror, not its other customers. In addition to patent and trademark usage, Plasma placed an advertisement in the June, 1972 issue of *Paper, Film and Foil Converter,* a national trade magazine which is distributed in Illinois. The ad describes Plasma's "no stik" thermally conductive release finish and states in small type at the bottom that Plasma is an affiliate of Mirror. According to Plasma's President, Thomas Nalband, this ad and designation were a single, isolated occurrence.

On the basis of this factual record, we must determine whether Roll Grinding and Plasma are amenable to service in Connecticut from an Illinois federal court. Neither corporation is incorporated or registered in Illinois, nor do they have offices or agents within Illinois. If a party is not an inhabitant of or found within the state where the

federal court is located, Rules 4(e) and 4(f) of the Federal Rules of Civil Procedure permit extraterritorial service in the manner provided by a federal or state statute. In this instance, both federal and state statutes are applicable.

In antitrust suits, Section 12 of the Clayton Act authorizes extraterritorial service of process. 15 U.S.C. § 22. However, extraterritorial service is permitted only if venue lies against the foreign corporation in the forum district. Venue is proper in that district if the corporation is an inhabitant, may be found, or transacts business there. A corporation is an "inhabitant" of the state of its incorporation, and is "found" in districts where it is present and carrying on continuous local activities. *CCP Corp. v. Wynn Oil Co.*, 354 F.Supp. 1275, 1278 (N.D.Ill.1973). Neither corporation satisfies these tests with respect to Illinois. The term "transacts business" is less easily defined. The general test for transacting business is whether, according to practical, everyday business concepts, the defendant carries on business of a substantial character within the district. *In re Chicken Antitrust Litigation*, 407 F.Supp. 1285, 1291 (N.D.Ga.1975). The substantiality of the defendant's business activity is determined by a pragmatic and case-by-case analysis of the corporation's quantitative and qualitative contacts with the district, including the dollar volume and percentage of its in-district sales and purchases, the continuity and regularity of its business activities within the district, and the existence of sales solicitation and advertising within the district. *Wynn* and *Chicken*, *supra.* If the defendant is found to come within the "transacts business" test of § 22, then the nationwide service of process provision in § 22 allows service running from the district where the action was filed to wherever the corporation may be found. *Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.*, 402 F.Supp. 262, 329 (E.D.Pa.1975).

In addition to Section 22 of the Clayton Act, Section 16 of the Illinois Civil Practice Act, Ill.Rev.Stat., ch. 110, § 16, permits personal service to be made upon any party outside the state if the party is a citizen or resident of Illinois or has submitted to the jurisdiction of Illinois courts. Roll Grinding and Plasma do not qualify as citizens or residents of the state. Section 17 of the Illinois Civil Practice Act implements Section 16 by detailing what is an "act submitting to jurisdiction." Under § 17, a non-resident corporation submits to the jurisdiction of Illinois courts if it a) transacts any business or b) commits a tortious act in Illinois and the cause of action arises from either a) or b).

This Illinois "long-arm" statute was intended to extend jurisdiction over non-residents to the extent permitted by the due process clause of the Fourteenth Amendment. Thus, the scope of the Illinois statute is measured by federal standards. *Fisons Limited v. United States*, 458 F.2d 1241, 1250 (7th Cir. 1972). In *International Shoe v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) the Supreme Court held that in order to exercise in personam jurisdiction over a non-resident defendant, due process requires that he have certain "minimum contacts" with the forum so that maintenance of the suit does not offend traditional notions of fair play and substantial justice. The minimum contacts test contemplates a case-by-case evaluation of the defendant's connections with the forum to determine what is fair and reasonable in the particular situation. "In applying this flexible test the relevant inquiry is whether a non-resident has engaged in some act or conduct by which he may be said to have invoked the benefits and protections of the laws of the forum." *Hutter Northern Trust v. Door County Chamber of Commerce*, 403 F.2d 481, 484 (7th Cir. 1968).

Under the applicable federal and state statutes, then, extraterritorial service of process over Roll Grinding and Plasma is authorized if the corporations transacted business or committed a tortious act in Illinois and have certain minimum contacts with the forum. Both the Clayton Act and the Illinois "long-arm" statute utilize a "transacting business" test. We find it un-

necessary to determine whether the concept has an identical meaning in both spheres of influence. Both are subject to the limitations of the due process clause. Since the Illinois statute is coextensive with those limits, the coverage of § 22 of the Clayton Act is either equivalent to or wholly included within the coverage of § 17.

■ We believe that neither Roll Grinding nor Plasma transact business in Illinois within the meaning of these statutes and the scope of the due process clause. Viewed most favorably to the plaintiff, the facts suggest only two possible theories connecting these corporations with Illinois. Neither is persuasive.

First, it is arguable that Roll Grinding and Plasma are in fact mere divisions or branches of a larger whole composed of all three Nalband-dominated corporations (Mirror, Plasma and Roll Grinding). Since it appears clear that Mirror has transacted business in Illinois through the frequent sales solicitations of its agent, Ronald Delaney, this theory would bootstrap Mirror's Illinois contacts into a device to reach Roll Grinding and Plasma.

There is support for this principle of treating separately incorporated entities as one in order to assert jurisdiction over an out-of-state corporation. The device is most often applied to assert jurisdiction over an out-of-state parent through the activities of its in-state subsidiary. In these cases courts speak of "piercing the veil" of the subsidiary to reach its actual owner, or describe the subsidiary as the "alter ego" or "agent" of the parent. The fundamental inquiry, however, is whether the separate local corporation is actually a branch of a larger whole, so that its jurisdiction-triggering activities are imputable to the absentee corporation. *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 425 (9th Cir. 1977). In determining the existence of a unified corporate enterprise for purposes of long-arm statutes, courts have treated the following factors as significant: whether the local and the absentee have overlapping stock ownership and interlocking directorates which evidence the lack of

independent decision-making, whether the corporations have an integrated sales system, whether the corporations hold out a unified public or marketing image such as through advertising and common use of trademarks, whether the corporations exchange a significant amount of records, documents and personnel, whether one corporation supplies technical and advertising expertise at its own expense to benefit another, and whether one corporation is a mere conduit for the products of another. *Wells Fargo, supra* at 426; *Zenith Radio, supra* at 327–28; *Hitt v. Nissan Motor Co., Ltd.,* 399 F.Supp. 838, 850 (S.D.Fla.1975).

We do not believe that Roll Grinding, Plasma, and Mirror are sufficiently integrated so as to permit a cross-fertilization of their jurisdictional contacts with Illinois. Despite overlapping ownership and management, each corporation has distinctly different manufacturing capabilities and products. Mirror can apply fluorocarbon polymers and plate chromium. Plasma can do only the former. Roll Grinding can do neither. The companies patronize each other's facilities, but no buy-sell arrangement is exclusive, billing is at arms-length, and each corporation has a sizeable outside clientele. There is no integrated sales system, but only an informal sales referral procedure. Delaney's sales activities on behalf of Plasma and Roll Grinding were not well-developed or systematic. Besides Delaney, there is no evidence of any other interchange of personnel or of corporate records. Finally, the isolated representations in Plasma's sales literature and magazine advertisement do not establish a common marketing image.

■ The second theory for bringing Roll Grinding and Plasma within the "transacting business" test is that Delaney was a common sales agent for all three corporations. The existence of an intercorporate agency is a sufficient basis for long-arm jurisdiction. *See Wells Fargo, supra* at 419–20. According to this analysis, Delaney's Illinois solicitation for Mirror also benefitted Plasma and Roll Grinding. However, Delaney was never employed or

paid by these two corporations for his sales efforts. At best, he voluntarily distributed sales literature for them on a few occasions and made referrals when his activities for Mirror brought him into contact with business which was suited to the other corporation's operations. Delaney's voluntary and independent efforts can hardly constitute a basis for finding that Roll Grinding and Plasma have deliberately or purposefully invoked the protections of Illinois law. Most importantly, there is absolutely no evidence connecting Delaney's efforts on behalf of these two corporations with an Illinois customer. Delaney travelled throughout the United States and Canada. His referrals and literature distributions may well have occurred outside Illinois. Therefore, Delaney's activities are no basis for asserting jurisdiction over Roll Grinding and Plasma. Accordingly, we conclude that Roll Grinding and Plasma have not transacted business in Illinois.

Besides attempting to show that Roll Grinding and Plasma have routine commercial contacts with Illinois, Chromium has alleged that these two corporations have conspired with Mirror to violate the antitrust laws and thus to injure Chromium's business in Illinois. The complaint alleges that defendants have used an overbroad and unjustifiable construction of Mirror's Letendre patent and its "easy release" trademark to intimidate Chromium and its customers with patent infringement litigation. As a result, competing manufacturers like Chromium have been forced to relinquish their share of this segment of the coatings market and their customers have been coerced into redirecting their orders for these coatings to Mirror. To further the Illinois branch of this conspiracy, Mirror allegedly sent letters to Chromium's Illinois offices charging Chromium with patent infringement and threatened to proceed with coercive litigation. Mirror also allegedly employed Chicago attorneys to carry on the litigation.

■ Chromium argues that Mirror's overt conspiratorial activities have tortious consequences in Illinois and are imputable to Roll Grinding and Plasma as co-conspirators, thereby providing a jurisdictional foundation under Section 17(1)(b) of the Illinois long-arm statute. That section confers jurisdiction over defendants whose tortious acts are committed in Illinois and give rise to plaintiff's cause of action. Since the word "tortious" includes any act which involves breach of duty to another and makes the actor liable in damages, antitrust claims come within the scope of the section. *Ohio-Sealy Mattress Mfg. Co. v. Kaplan*, 429 F.Supp. 139 (N.D.Ill.1977).

■ Chromium's theory is that if one co-conspirator commits an overt act causing tortious injury in Illinois, all participants in the conspiracy are deemed to have subjected themselves to the jurisdiction of the Illinois courts. Here the alleged overt act was performed by Mirror alone. Chromium does not point to any overt tortious acts connecting Roll Grinding or Plasma with Illinois. We have already held that these two corporations do not transact business in Illinois. Thus the co-conspirator theory would permit jurisdiction over defendants with no direct contacts with the forum district.

We cannot subscribe to this theory. Conspiratorial activities having tortious consequences in this district, at least in the amount shown here, are not a sufficient basis for jurisdiction in the absence of any other contacts. *Weinstein v. Norman M. Morris Corp.*, 432 F.Supp. 337, 345 (E.D. Mich.1977). If jurisdiction could be established by merely alleging that a corporate defendant participated in a conspiracy and that one member of the conspiracy committed a tort in the district, antitrust plaintiffs would be able to reach absent co-conspirators with no independent contacts with the forum. We see no basis for engrafting a broad conspiratorial accretion on the scope of the long-arm statutes. Other courts have rejected the co-conspirator theory as a means of enlarging the "transacting business" test of the antitrust venue statutes. *See Weinstein, supra; West Virginia v. Morton International, Inc.*, 264 F.Supp. 689 (D.Minn.1967).

At minimum, due process requires a factual showing of a conspiracy and a factual connection between the acts of the conspirator who was present in the jurisdiction and the conspirator who was absent. *Leasco Data Processing Equipment Corp. v. Maxwell*, 319 F.Supp. 1256, 1261 (S.D.N.Y.1970). Plaintiff has not attempted to make such a factual showing here. On the other hand, defendants have presented affidavits by officers of Roll Grinding and Plasma which specifically deny Chromium's allegation that anyone ever acted on behalf of those corporations in threatening Chromium or its customers with patent infringement litigation. These affidavits, which are based on personal knowledge, are to be credited over contradictory allegations in Chromium's complaint that are based on information and belief. *Leasco Data, supra* at 1260. In addition, since Roll Grinding does not compete in the market for FPC coatings, and Plasma only coats fluorocarbon for Mirror, there is virtually no evidence to support an inference that Roll Grinding and Plasma would stand to reap substantial benefits from Mirror's alleged tortious conduct. Without such a financial incentive, the likelihood of an actual conspiracy is remote at best.

Chromium's reliance on *United States Dental Institute v. American Association of Orthodontists*, 396 F.Supp. 565 (N.D.Ill. 1975) is misplaced. There the court found in personam jurisdiction over five antitrust defendants who allegedly conspired to restrict the number of practicing orthodontists. The court also found that by voting in out-of-state board meetings to challenge plaintiff's educational certification in Illinois, each defendant submitted to Illinois jurisdiction. The defendants actively participated in the organizational meetings, and these extraterritorial acts had tortious consequences in Illinois within the scope of § 17(1)(b) of the Illinois long-arm statute. By contrast, in the present case there is no evidence that Roll Grinding or Plasma played any role in Mirror's alleged decision to send a letter to Chromium's Illinois offices charging them with patent infringement and threatening them with coercive litigation.

Therefore, under either the "transacting business" or "tortious act" tests, Roll Grinding and Plasma do not have sufficient contacts to create a jurisdictional foundation for service of process and their motions to quash service and to dismiss for lack of in personam jurisdiction are granted.

## Lanham Act Claim

Mirror has moved to dismiss Count 4 of Chromium's amended complaint on the ground that Chromium lacks standing to sue. Alternatively, it seeks summary judgment and presents affidavits to demonstrate the absence of any genuine issue of material fact.

Count 4 is based on section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). That section provides, in pertinent part:

> Any person who shall . . . use in connection with any goods or services . . . a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, . . . shall be liable to a civil action by any person . . . who believes that he is or is likely to be damaged by the use of any such false description or representation.

Chromium claims that Mirror has made four false and misleading representations in advertising and promoting its FPC surfaces. First, Mirror has allegedly described its "easy release" process and finish as patented, when in fact a) its process is not covered by the Letendre patent and b) the patent itself is invalid. Second, Mirror has allegedly claimed "easy release" as its trademark, when in fact a) the trademark is not registered and b) the trademark is invalid because it is merely descriptive. Third, Mirror has allegedly described its "Crepe-Tex" process and finish as patented, when in fact the "Crepe-Tex" finish is not patented. Finally, Mirror has allegedly used the "Crodon" designation in connection with its goods and services, when in

fact "Crodon" is not Mirror's trademark and instead is a registered trademark of Chromium Corporation of America (CCA). CCA is not a party to this lawsuit.

Chromium claims that these representations have injured its business in two ways. They lead purchasers of such goods and services to believe that Mirror has the exclusive right to apply and sell FPC surfaces. Since Chromium and Mirror are competitors in the market for these coatings, Mirror's claim of exclusivity will tend to divert purchasers from Chromium to Mirror so as to avoid the potential harassment of patent or trademark infringement suits. In addition, the "Crodon" and "Crepe-Tex" designations are the same as those used by CCA to describe similar goods. As a result, customers identify Mirror's products with those made by CCA. Although Chromium does not complete the chain of injury linking CCA and its own business, we infer that Mirror's duplication of the CCA marks creates an implied representation that its goods are of a unique or superior quality, resulting in a diversion of sales from Chromium to Mirror.

Mirror argues that these injuries do not satisfy the standing requirements of section 43(a). That section requires that plaintiff be a person "who believes that he is or is likely to be damaged by the use of" the designation. In Mirror's view, Chromium cannot complain about Mirror's use of the "easy release" or "Crodon" trademarks because these marks are not identified with Chromium's goods. It is undisputed that Chromium does not use either of these designations. Hence, there is no likelihood of consumer confusion between Chromium's and Mirror's products, and no possibility of sales diversion. Mirror also sees no injury flowing to Chromium from Mirror's description of the "easy release" and "Crepe-Tex" surfaces as patented. It argues that the use of markings under an allegedly invalid patent do not constitute false advertising within the scope of the Lanham Act and that Chromium has never used the Letendre patent in connection with its products.

In our view, defendant's motion raises two separate questions, namely whether Chromium has standing and whether the alleged misrepresentations fall within the Act. The latter issue challenges the validity of Chromium's claim that a statutory violation exists. Since standing does not depend on the merits of plaintiff's claim, the threshold inquiry is focused solely on the sufficiency of the alleged injury. *See American Medical Association v. Mathews,* 429 F.Supp. 1179, 1189 (N.D.Ill.1977).

■ The "likely to be damaged" formulation of section 43(a) envisions a relatively broad class of suitors. *L'Aiglon Apparel v. Lana Lobell, Inc.,* 214 F.2d 649, 651 (3d Cir. 1954). While it has been interpreted to exclude consumers, *Colligan v. Activities Club of New York,* 442 F.2d 686 (2d Cir. 1971), it encompasses any business competitor, either direct or indirect, who may suffer adverse consequences from a statutory violation. *Rare Earth, Inc. v. Hoorelbeke,* 401 F.Supp. 26, 39 (S.D.N.Y.1975). Specifically, plaintiff must allege that the false statements have caused a direct diversion of sales from itself to the defendant, or a lessening of the goodwill which its products enjoy with the buying public. *Skil Corp. v. Rockwell Int'l Corp.,* 375 F.Supp. 777, 783 (N.D.Ill.1974). In addition, there must be a real possibility of damage and not the mere assertion of a belief. *D. M. & Antique Import Corp. v. Royal Saxe Corp.,* 311 F.Supp. 1261, 1269 n. 6 (S.D.N.Y.1970).

In a typical Lanham Act action, a newcomer's product or trademark is confusingly similar to that of a well-established competitor. The confusing similarity supports the conclusion that the newcomer is attempting to divert prospective purchasers and "cash in" on its competitor's well-developed reputation in the market. *See, e. g., Menley & James Laboratories v. Approved Pharmaceutical Corp.,* 438 F.Supp. 1061 (N.D.N.Y. 1977) (parties used A.R.M. and ARCOMP to describe a similar allergy relief medicine). In these cases there is a direct diversion of trade from plaintiff to defendant. Diversion is also likely where defendants use a mark to describe simulated goods in a man-

ner that suggests they are original goods produced by the plaintiff. *See, e. g., Mutation Mink Breeders Ass'n v. Lou Nierenberg Corp.*, 23 F.R.D. 155 (S.D.N.Y.1959) ("Normink" used by defendant to describe a synthetic mink garment"). In both cases the consumer is deceived, either that defendant's product is more reputable than it is, or that simulated goods are the real thing. That deception influences purchasing decisions, and reduces plaintiff's sales volume.

In the present case, the alleged diversion of sales is of a different genre. Chromium contends that Mirror's false and misleading use of trademarks and patents raises a false impression with purchasers that Mirror is the only authorized source of FPC surfaces. A claim of exclusivity can be used to bring infringement suits against competitors or purchasers who attempt to operate an independent market for the same goods. Unlike the typical situation of diversion caused by confusingly similar marks between competitors' products, the diversion here is caused by the threat of litigation.

A similar standing issue has arisen under the trademark laws. In a trademark registration action, 15 U.S.C. § 1063 provides that "Any person who believes that he would be damaged by the registration of a mark upon the principal register may, . . . file a verified opposition" to the registration. This language is nearly identical to that in 15 U.S.C. § 1125(a). *Tanners' Council of America, Inc. v. Gary Industries, Inc.*, 440 F.2d 1404, 1406 (Cust. & Pat.App. 1971). Registration of a trademark is prima facie evidence of the registrant's exclusive right to use the mark in commerce in connection with its goods. 15 U.S.C. § 1115(a). Implicit in an exclusive right is the right to exclude others and to monopolize the market. *DeWalt, Inc. v. Magna Power Tool Corp.*, 289 F.2d 656, 661, 48 CCPA 909 (1961). The registration of improper marks, such as those which are merely descriptive of the goods, handicaps those who

have the right to freely use the mark by subjecting them to the threat of harassment and litigation. Hence, it is well-established that injury to a trademark opposer will be presumed or inferred when the mark sought to be registered is descriptive of the goods and the opposer has a sufficient interest in using the descriptive term in his business. *DeWalt, Inc., supra* at 661; *Schulmerich Electronics v. J. C. Deagan, Inc.*, 202 F.2d 772, 779, 40 CCPA 857 (1953); *United Shoe Machinery Corp. v. Compo Shoe Machinery Corp.*, 56 F.2d 292, 296–97 (Cust. & Pat.App. 1932).

The present case comprises both patent and trademark representations. For trademarks, standing under § 43(a) is established if the plaintiff competes with defendant in the sale of goods covered by the term and uses or is likely to use the challenged mark. *See Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp., Inc.*, 397 F.Supp. 1063, 1073 (W.D.Pa.1975). If these requirements are met, the threat posed by claims of exclusivity is sufficient to create a cognizable injury. The situation for patents is somewhat different. A patentee has the right to exclude others from making, using or selling his invention. 35 U.S.C. § 154. Thus, for patents, standing is established if the plaintiff competes with defendant in the market for the purportedly patented goods and the plaintiff makes, uses, or sells those goods or is likely to do so. Again, if these requirements are met, the threat posed by claims of patent exclusivity is sufficient to create a cognizable injury.[1]

We now apply these principles to the four claims Chromium asserts here. Two claims relate to patents, and two relate to trademarks.

One of the patent-related claims challenges Mirror's description of its "easy release" process and finish as patented. This process entails the application of a FPC surface. Chromium has alleged that it

1. 35 U.S.C. § 281 provides that: "A patentee shall have remedy by civil action for infringement of his patent."

is engaged in the business of applying such a coating and that it competes for sales of the coating with Mirror in the same market. (Amended Complaint, ¶¶ 9, 18 and 37). Thus Chromium has standing to raise this claim.

 The second patent-related claim attacks Mirror's description of its "Crepe-Tex" process and finish as patented. "Crepe-Tex" describes a chromium-plated surface which is textured to simulate the creping surface of a cast iron roll or drum. (Nalband affidavit, ¶ 3). Chromium has not alleged that it makes, uses or sells this coating, or that it competes with Mirror for sales of the coating. Instead, it claims that "Crepe-Tex" is made and used by CCA, an unrelated corporation, and we have inferred that Mirror's alleged use of the term creates an impression of unique or superior quality. Even if we assume such a representation of quality, we fail to see how Chromium could be injured by its use. If Chromium does not apply this type of finish, the diversion of sales will only occur between CCA and Mirror. Chromium has shown no basis for asserting the rights of CCA, a third party to this action. Hence, it lacks standing to raise the "Crepe-Tex" issue.

 The trademark-related claims focus on Mirror's allegedly improper use of the terms "easy release" and "Crodon" in connection with its goods and services. The "easy release" term describes a FPC coating similar to that which Chromium produces and sells. However, since Chromium has not alleged that it currently uses or is likely to use this term in its marketing efforts,[2] there can be no threat of trademark infringement litigation and no potential injury. Therefore, Chromium lacks standing on this claim. The "Crodon" term is a CCA trademark. (Nalband affidavit, ¶ 5). Chromium has not alleged that it either uses the term or makes the goods

described by it.[3] Instead, it relies on the same argument that the term belongs to CCA, creates a representation of quality, and diverts sales. For the reasons discussed earlier, we reject this contention. Thus, Chromium lacks standing on both of its trademark-related claims.

In addition to its standing arguments, Mirror contends that the alleged patent-related misrepresentations do not fall within the scope of § 43(a). The only remaining claim on which Chromium has standing is its contention that Mirror has wrongly described its "easy release" process and finish as patented. It is undisputed that in 1969 Mirror purchased from CCA the Letendre patent covering a certain type of FPC surface, and the associated "easy release" mark for that surface. (Nalband affidavit, ¶ 6). Hence, Chromium cannot and does not argue that Mirror falsely represents its goods to be covered by a nonexistent patent. Rather Chromium alleges that Mirror falsely represents that its "easy release" coating is covered by the existing Letendre patent and that these patent rights give Mirror the exclusive right to apply FPC surfaces. (Amended Complaint, ¶¶ 27, 37–40). Chromium attacks the verity of the first representation, the claim of patent coverage, on the basis that the "easy release" process actually omits a necessary step in the Latendre patent and that the patent itself is invalid for reasons such as obviousness, prior use, and laches. Chromium challenges the truth of the second representation, the claim of product exclusivity, on the basis that Chromium applies and sells a FPC surface which does not infringe the Letendre patent and which should be freely marketable as a competitor to Mirror's FPC surface.

 We find that only one of these representations, the claim of product exclusivity, can constitute an actionable misrepresentation within § 43(a). *Tubeco, Inc. v.*

---

**2.** Chromium once had a license from CCA to use the "easy release" designation. That license expired on November 14, 1970, a quinquennium prior to the commencement of this action. (Pltf's Exh. F, ¶¶ 8, 19).

**3.** In fact, in 1968 Chromium agreed with CCA that it would not use the "Crodon" mark. (Pltf's Exh. F, ¶ 8).

*Crippen Pipe Fabrication Corp.,* 402 F.Supp. 838 (E.D.N.Y.1975), *aff'd without opinion,* 538 F.2d 314 (2d Cir. 1976) is persuasive on this issue. Defendant Crippen patented a hot pipe bending apparatus and process. He then sought to form a company to manufacture it. He sent brochures and letters to potential customers and financing institutions to drum up support for his enterprise. The materials lauded the quality and utility of his patented apparatus. Plaintiff Tubeco believed that it was the true developer of this apparatus, and that it had been using the same process for many years. It sued Crippen under § 43(a), alleging that Crippen's promotional materials falsely misrepresented the developer of the process and falsely suggested its exclusivity.

The court rejected each of these arguments and held that false patent claims are not the kind of unfair competitive activity at which the Lanham Act is directed. On the issue of patent validity and coverage, the court reasoned that

> "There can be no 'falsity' about the patent; its existence is a fact and by law it must be presumed valid until its invalidity is established by a party contesting it, 35 U.S.C. § 282, and the Lanham Act does not provide a jurisdictional basis for such a contest." 402 F.Supp. at 847.

The same analysis applies here. Insofar as Chromium challenges Mirror's representations as to the coverage and validity of its patent, the complaint fails to state a claim under § 43(a). Mirror can hardly deceive its customers about its patent rights when the patent is presumptively valid. Chromium's remedy is an action for a declaratory judgment on the validity of the patent, not an action for false advertising. *See also, Noma Lites Canada Ltd. v. Westinghouse Electric Corp.,* 399 F.Supp. 243, 254–55 (D.D.C.1975).

On the issue of product exclusivity, the *Tubeco* court stated:

> "In no way is the patent so identified with Tubeco or its products as to create a

false impression in the trade that Crippen is now the exclusive source or origin of hot pipe bending services previously supplied by Tubeco. Indeed, as already noted, Tubeco claims its processes do not infringe the patent and Crippen agrees, a consensus suggestive of difference rather than identity between their respective processes." 402 F.Supp. at 847.

In *Tubeco,* the only allegation was that use of the patent falsely suggested exclusivity. The court in effect held that patent marking by itself does not create a sufficient claim of exclusivity to infer a diversion of sales and resulting injury to a competitor. This is especially true when both parties express the opinion that one of their products is covered by the patent and the other is not, since both products then remain free to romp in the marketplace.

The allegations of the instant complaint call for a different result. According to Chromium's assertions, Mirror has told customers in the roll finishing industry that it has the only FPC surface on the market, that this surface is covered by its Letendre patent, and that Chromium's FPC surface infringes upon Mirror's patent.[4] Furthermore, Chromium says that Mirror made these statements even though it knew that Chromium's process did not infringe the Letendre patent. The avowed purpose of this scheme was to use its knowingly overbroad interpretation of its patent rights to capture Chromium's customers and monopolize the market. In these circumstances, Mirror's representations would create a false impression in the trade that it is the exclusive source of FPC surfaces. Therefore, Chromium's allegations of product exclusivity do state a claim for relief under § 43(a).

In sum, we have found that Chromium lacks standing to assert three of its four claims in Count 4, and fails to state a claim for part of the fourth. Mirror's motion to dismiss Count 4 is granted except for the allegations concerned with product exclu-

---

**4.** Mirror has filed a counterclaim for patent infringement against Chromium in the present action.

sivity. Mirror has also moved for summary judgment on Count 4, but its factual materials are not directed to the remaining claim. Therefore, we deny Mirror's summary judgment motion.

*Antitrust and Unfair Competition Claims*

Mirror's last motion is for summary judgment on Counts 2 and 3 of the amended complaint. Both parties have drawn from the extensive deposition testimony to make their contentions on this motion.

Count 2 alleges that Plasma, Roll Grinding and Mirror have conspired to monopolize or attempt to monopolize the relevant market for FPC coatings, and to raise, stabilize and maintain prices in this market, by threatening plaintiff and its customers with unjustified patent infringement actions, in violation of Sections 1 and 2 of the Sherman Act. Chromium asserts that after Mirror threatened two of Chromium's customers with litigation, both withdrew virtually all their business from Chromium. The defendants allegedly are using these threats in an attempt to extend their patent beyond its lawful scope. Chromium claims that Mirror knows that Chromium's products do not infringe its patents, but nevertheless is employing its patent as an economic force to intimidate its competition, with the specific intent of monopolizing the entire field of FPC coatings.

Count 3 is based on Illinois laws of unfair competition. It contains similar allegations that Mirror's threats were made in bad faith in an effort to injure Chromium's business.

 The institution of an ill-founded patent enforcement scheme can constitute an antitrust violation if it is part of a purposeful drive to eliminate competition and to monopolize an industry. *Kobe, Inc. v. Dempsey Pump Co.,* 198 F.2d 416, 424–25 (10th Cir. 1952); *Dairy Foods, Inc. v. Dairy Maid Products Corp.,* 297 F.2d 805, 809 (7th Cir. 1961). The principle is based on the view that the judicial system should not be a vehicle for acquiring, maintaining, or furthering an unlawful monopoly. *See California Motor Transport v. Trucking Unlim-*

*ited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The mere coincidence of an antitrust violation and a patent infringement suit is not enough. The suit must be in furtherance of and an integral part of the plan to violate the antitrust laws. *Rex Chainbelt, Inc. v. Harco Products, Inc.,* 512 F.2d 993, 1005–06 (9th Cir. 1975). It is no defense that the defendant brought the infringement action with a good faith belief that its patents were infringed. *Kobe, supra* at 424; *Handguards, Inc. v. Johnson & Johnson,* 413 F.Supp. 921, 924 (N.D.Cal. 1975); *but see Bolt Associates, Inc. v. Rix Industries,* 1973 Trade Cas. ¶ 74,474 (N.D. Cal.1973). The fact that a patent is valid and infringed will not preclude the finding of an antitrust violation. *Sulmeyer v. Seven-Up Co.,* 411 F.Supp. 635, 644 (S.D.N.Y. 1976). However, the defendant must have a bad faith, predatory intent to attain an anticompetitive end, as opposed to a purely defensive motivation to protect its patent interests. *Handguards, supra* at 924–25; *Rex Chainbelt, supra* at 1005. "The willful acquisition of illegal exclusionary power in the relevant market can be properly inferred from the accumulation of patents for anticompetitive purposes, the bring of infringement actions on patents of weak and doubtful validity, and the dissemination of threats in the marketplace." *Handguards, Inc. v. Johnson & Johnson,* 1976–2 Trade Cas. 7161, 138 (N.D.Cal.1976). Monopolistic intent can also be shown by an attempt to extend a patent beyond the scope of its applicable products or processes, or its limited lifespan. *Ethyl Gasoline Corp. v. United States,* 309 U.S. 436, 456, 60 S.Ct. 618, 84 L.Ed. 852 (1940); *Jack Winter Inc. v. Koratron Co., Inc.,* 375 F.Supp. 1, 71 (N.D.Cal. 1974).

 Similar principles control actions for unfair competition. A patentee cannot lawfully circulate false statements that its competitor's products infringe its patents and threaten infringement suits in bad faith for the purpose of inhibiting customer purchasers and injuring the competitor's business. *Maytag Co. v. Meadows Mfg. Co.,* 35 F.2d 403, 408 (7th Cir. 1929);

*Racine Paper Goods Co. v. Dittgen,* 171 F. 631 (7th Cir. 1909). However, the patentee may distribute circulars notifying a competitor's customers of the pendency of an infringement suit and warning them of similar actions, if he acts in good faith and does not try to intimidate persons who would not be under legal liability for using and selling the competitor's product. *Ai-Fab Aluminum Fabricators, Inc. v. Wagner,* 220 F.Supp. 715 (N.D.Ill.1963); *American Sign & Indicator Corp. v. Schulenberg,* 167 F.Supp. 20, 30 (E.D.Ill.1958), aff'd 267 F.2d 388 (7th Cir. 1959). To be in good faith, the communications to the customers must not contain any misstatements or other language which is unsupported by the allegations of the complaint in the pending infringement action. *Wagner, supra* at 717–18. Good faith can be inferred from proof that the patentee owned the patent and believed it to be valid at the time of the communications, *Schulenberg, supra* at 30, but can be negated by proof that the patentee failed to bring the threatened infringement action against its competitor within a reasonable time after its warnings to its rival customers. *Dittgen, supra* at 635 (six year delay).

■ Applying these principles to the present record, we find there are genuine issues of material fact which preclude the granting of Mirror's motion for summary judgment. Chromium has introduced the following evidence.

According to Chromium's President, Mr. Cheris, the FPC process is commonly applied to large drums, and the roll finishing industry is limited to Chromium and Mirror for very large drums. In 1971, Mirror accused Chromium of patent infringement, but Chromium's denials and offers for a licensing arrangement were unproductive. Mirror did not sue Chromium for patent infringement until five years later.

Mirror's President testified that he told the purchasing agent of one of Chromium's customers, Beloit Corporation, that an "easy release" FPC surface was a patented process and available only from Mirror. This testimony is supported by Chromium's

sales manager, Mr. Wilbor, who said he was told by Beloit's purchasing agent, Mr. Reimer, that Chromium could not get FPC business from Beloit without violating Mirror's patent. Wilbor also heard that, when Beloit sent a roll to Chromium several months earlier for application of an FPC surface, Mirror told Beloit never to send Chromium such a roll again because it was a violation of Mirror's patent.

Between 1972 and 1975, Chromium noticed an unexplained drop in its sales to Beloit—a pattern which ended when Chromium filed its present action. This sales void included an absence of orders for plating services other than FPC surfaces. Thus sales of related plating services seemed to follow the trend of FPC orders. In 1975, Reimer showed Wilbor Beloit's sales files. Mirror's file was 3 to 4 times as thick as the Chromium file. However, Beloit could save freight costs by placing orders with Chromium.

Mr. Wilbor also testified about a sales trip in 1975 to S. D. Warren Company, a former Chromium customer. During that visit, Warren's plant engineer told Wilbor that FPC surfaces were "an exclusive with Mirror."

To rebut this showing, Mirror points to Reimer's testimony that Mirror has never threatened Beloit with patent infringement, has never intimidated Beloit, and has never recklessly asserted its patent rights against Beloit. In our view, this testimony is inadmissible because it was induced by clearly leading questioning from Mirror's counsel. Chromium properly objected to this entire line of questioning.

Although we have serious doubts whether Chromium's submissions could support a prima facie case, the record does raise substantial factual issues which preclude summary judgment. There is evidence of threats of patent litigation, customer apprehension, and diversion of sales. There is also a substantial issue whether Chromium's FPC process is covered by Mirror's patent, so that Mirror's activities can be characterized as an improper extension of

its limited patent monopoly.[5] The lines of causation appear weak, and Mirror's motivation and purpose are unclear. Issues of intent are properly left for a full factual exploration at trial. *Sulmeyer v. Seven-Up Co.,* 411 F.Supp. 635, 644 (S.D.N.Y.1976). Although Chromium has introduced virtually no evidence of joint conspiratorial activities among Roll Grinding, Plasma and Mirror, the interrelationship between these corporations provides a colorable basis for suggesting an agreed policy uniting their business activities. Accordingly, Mirror's motion for summary judgment on Counts 2 and 3 is denied.

Judgment will enter dismissing plaintiff's action against defendants Roll Grinding Corporation of America and Plasma Coatings, Inc., for want of personal jurisdiction. Portions of Count 4 are dismissed for lack of standing and failure to state a claim. Defendant Mirror Polishing and Plating Co., Inc.'s motion for summary judgment as to Counts 2 and 3 is denied. Cause set for status report on May 16, 1978 at 9:30 a.m.

---

5. In our earlier preliminary injunction, we found that Chromium had made a substantial showing that it does not practice the necessary fourth step of the Letendre process. (Finding of Fact No. 15).