**MANILDRA MILLING CORPORATION, Plaintiff and Counterclaim Defendant,**

v.

**OGILVIE MILLS, INC., Defendant, Third–Party Plaintiff and Counterclaimant,**

v.

**HENKEL CORPORATION, Henkel of America, Inc., Defendants and Third–Party Defendants,**

**and**

**John Thomas Honan, Counterclaim Defendant.**

Civ. A. No. 86–2457–S.

United States District Court, D. Kansas.

June 15, 1992.

Edward L. Bailey, Carol B. Bonebrake, Charles T. Engel, Cosgrove, Webb & Oman, Topeka, Kan., Charles D. Horner, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., W. Stanley Walch, Mark Sableman, Thompson & Mitchell, St. Louis, Mo., William K. West, Wayne Jones, Cushman, Darby & Cushman, Washington, D.C., Tim S. Haverty, Dennis L. Davis, Hillix, Brewer, Hoffhaus, Whittaker & Wright, Kansas City, Mo., Murray J. Belman, Thompson & Mitchell, Washington, D.C., for Manildra Mill. Corp. and John Thomas Honan.

Robert D. Benham, McAnany, Van Cleave & Phillips, P.A., Kansas City, Kan., Bruce H. Weitzman, McDermott, Will & Emery, Chicago, Ill., Eugene Sabol, Paul Grandinetti, Mark Lee Hogge, Fisher, Christen & Sabol, Washington, D.C., Byron L. Gregory, McDermott, Will and Emery, Chicago, Ill., for Ogilvie Mills, Inc.

Michelle M. Suter, McDowell, Rice & Smith, P.C., Overland Park, Kan., Robert P. Smith, McDowell, Rice and Smith, Kansas City, Mo., John D. Gould, Daniel W. McDonald, Alan G. Carlson, Merchant, Gould, Smith, Edell, Welter & Schmidt, P.A., Minneapolis, Minn., Robert L. Baechtold, David F. Ryan, Fitzpatrick, Cella, Harper & Scinto, New York City, for Henkel Corp. and Henkel of America, Inc.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court pursuant to numerous post trial motions in the above-captioned case.[1]

This action involves a longstanding dispute between the plaintiff and counterclaim defendant Manildra Milling Corporation ("Manildra") and the defendant, counterclaimant and third-party plaintiff Ogilvie Mills, Inc. ("Ogilvie") regarding the validity of various claims of two patents issued by the Patent and Trademark Office. The patent claims-in-issue cover the manufacture and sale of large-granule wheat starch, a product used in the manufacture of carbonless copy paper. Large-granule wheat starch is uniquely suited for use as a coating or stilt material which protects ink-containing microcapsules from prematurely rupturing and smudging the surface of carbonless copy paper. Since the filing of the patents-in-suit, large-granule wheat starch has become the primary stilt material for carbonless copy paper. There are only three producers of large-granule wheat starch in the entire United States. Two of the producers are parties involved in this lawsuit. The third producer, Midwest Grains, Inc. ("Midwest Grains") sells large-granule wheat starch pursuant to a license agreement entered into between itself and Ogilvie's predecessor patent owner, the Henkel Corporation ("Henkel").

In this action, Manildra sought a declaration that Ogilvie's patents were not valid or enforceable and that Manildra had not infringed two patents which are owned by Ogilvie. Manildra further sought recovery for injuries which it claimed were caused by activities related to the ownership of the patents. These claims included both federal and pendent state tort claims. Specifically, Manildra contended that Ogilvie had violated federal antitrust laws, the Lanham Act, 15 U.S.C. § 1125, which forbids false descriptions in the sale of goods in interstate commerce, and state law which forbids unfair competition and tortious inter-

---

1. The court finds that oral argument will not materially aid the court in the disposition of the motions currently pending before the court.

Accordingly, the court denies Ogilvie Mills, Inc.'s request for oral argument (Doc. 1154). D.Kan. 206(d).

ference with prospective economic advantage. Ogilvie filed a counterclaim seeking to recover damages from Manildra and its principal shareholder, John Thomas Honan ("Honan"), for infringement of the two patents.

Beginning on August 26, 1991, and continuing until February 26, 1992, the claims between Manildra and Ogilvie were tried to a jury. On January 15, 1992, the case was submitted to the jury and on February 26, 1992, after approximately six weeks of deliberations, the jury returned a verdict in favor of Manildra on its claims that the patent claims-in-issue were invalid and that Manildra had not infringed these claims. The jury also returned a verdict in favor of Manildra on its claims under the Lanham Act, and its state claims for tortious interference with prospective economic advantage and for injurious falsehood.

Ogilvie now moves for judgment as a matter of law, for a new trial, and for remittitur. Manildra moves the court for a new trial on its antitrust claims, and for increased damages and attorneys' fees under both the Lanham Act and patent laws. Both parties move to amend the judgment, and for Rule 54(b) certification so that this matter may be appealed. Also before the court is Ogilvie's request for a ruling on its motion to correct inventorship, and two outstanding motions by Manildra and Ogilvie for sanctions.

 In reviewing a motion for judgment as a matter of law, the district court may grant the motion only if the facts and inferences in the case point so strongly and overwhelmingly in favor of one party that the court should find that reasonable persons could not arrive at a contrary verdict. *Downie v. Abex Corp.*, 741 F.2d 1235, 1238 (10th Cir.1984).[2] That is, the question is not whether there exists no evidence supporting the party against whom the motion is directed, but whether there is any evi-

dence upon which the jury could properly find a verdict for that party. *K–B Trucking Co. v. Riss Int'l. Corp.*, 763 F.2d 1148, 1163 (10th Cir.1985). Furthermore, in considering the motion, the trial judge must consider all the evidence and the reasonable inferences derived therefrom in the light most favorable to the party against whom the motion is directed. *Downie*, 741 F.2d at 1238. In considering a motion for judgment as a matter of law, the court presumes that the jury resolved the underlying factual disputes in favor of the verdict winner; these presumed findings remain undisturbed if they are supported by substantial evidence. *Jurgens v. McKasy*, 927 F.2d 1552, 1557 (Fed.Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 281, 116 L.Ed.2d 232 (1991) (citing *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984)).

 With regard to motions for a new trial, "[g]enerally, motions for a new trial are committed to the discretion of the district court." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984). In reviewing a motion for new trial, the court should "exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial." *McDonough Power Equip., Inc.*, 464 U.S. at 553, 104 S.Ct. at 848. "[T]he party seeking to set aside a jury verdict must demonstrate trial errors which constitute prejudicial error or that the verdict is not based on substantial evidence." *White v. Conoco, Inc.*, 710 F.2d 1442, 1443 (10th Cir.1983). The alleged trial court errors must be prejudicial and clearly erroneous, rather than harmless. Also, no error in the admission or exclusion of evidence, and no error in any ruling or order of the trial court or anything done or omitted by the court, can be grounds for

**2.** Although this action will be appealed to the Federal Circuit Court of Appeals, procedural issues not unique to the patent laws, *i.e.*, such as the standard for granting or denying a motion for judgment as a matter of law, require the application of the regional Circuit's law. *See Wahpeton Canvas Co., Inc. Frontier, Inc.*, 870

F.2d 1546, 1552 n. 8 (Fed.Cir.1989); *Sjolund v. Musland*, 847 F.2d 1573, 1576 (Fed.Cir.1988) (citation omitted). Accordingly, the court will apply Tenth Circuit law in determining whether Ogilvie's motion for judgment as a matter of law should be granted or denied.

granting a new trial unless the error or defect affects the substantial rights of the parties. Fed.R.Civ.P. 61; *Rasmussen Drilling, Inc. v. Kerr–McGee Nuclear Corp.*, 571 F.2d 1144, 1148–49 (10th Cir.), *cert. denied,* 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978). Trials must be fair, not perfect. *McDonough Power Equip., Inc.,* 464 U.S. at 553, 104 S.Ct. at 848; *Devices for Medicine, Inc. v. Boehl,* 822 F.2d 1062, 1066 (Fed.Cir.1987).

## I. OGILVIE'S POST TRIAL MOTIONS

### A. Motion for a New Trial

The court will first address Ogilvie's post trial motions. As an initial matter, the court finds no merit in the arguments asserted by Ogilvie in its motion for a new trial. During the six months of trial an adequate record was established for the court's evidentiary rulings and rulings with regard to the jury instructions. Indeed, the parties were given many opportunities to challenge the court's proposed jury instructions. The court stands by its previous rulings and will not address each of Ogilvie's assertions of error, except to find that if any errors were made, they were harmless to the outcome of this case.

■■■■ With regard to Ogilvie's allegation that the jury reached an inconsistent verdict, the court finds that when confronted with an apparently inconsistent verdict, courts are to "search for a reasonable way to read the verdicts as expressing a coherent view of the case, and must exhaust this effort before it is free to disregard the jury's verdict" and grant a new trial. *Richardson v. Suzuki Motor Co., Ltd.,* 868 F.2d 1226, 1238 (Fed.Cir.), *cert. denied,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989) (citations omitted). Moreover, where a party has failed to object to apparent inconsistencies in the verdict form before the jury is discharged, that party has waived any objections to inconsistencies under Fed.R.Civ.P. 49(b). *See White v. Celo-*

*tex Corp.,* 878 F.2d 144, 146 (4th Cir.1989), *cert. denied,* 493 U.S. 964, 110 S.Ct. 406, 107 L.Ed.2d 372 (1989); *Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.,* 791 F.2d 1416, 1422 (10th Cir.1986), *cert. denied,* 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986).

■■■ The court finds that the jury verdict does not contain any inconsistencies. The mere fact that the jury did not find that the patents were invalid for misuse or inequitable conduct (interrogatories 2 and 10), is not irreconcilable with the jury's conclusion that Ogilvie wrongfully asserted its patents which Ogilvie knew, or should have known, were invalid (interrogatories 18, 22–24). While these jury interrogatories and responses do involve misuse of patents, the jury's response to interrogatory 10 found that the '718 patent was not rendered invalid for misuse. In contrast, the latter interrogatories of the jury verdict, 18, 22–24, dealt with whether Ogilvie had wrongfully asserted its patent rights despite knowing of the patent claims' invalidity. The court finds the jury's responses to these interrogatories are consistent. Accordingly, the court finds the jury's verdict to be reconcilable.[3]

### B. Ogilvie's Motion for Judgment as a Matter of Law

Ogilvie moves the court to vacate the portion of the judgment against Ogilvie and to grant judgment as a matter of law on all counts of the complaint and counterclaim under Fed.R.Civ.P. 50, on grounds that Ogilvie proved by a preponderance of the evidence that Manildra and Honan infringed the patent claims in issue both literally and under the doctrine of equivalents. Ogilvie further contends that Manildra failed to establish by evidence which is clear and convincing that the patent claims in issue are invalid. Finally, Ogilvie contends that Manildra failed to establish the

---

**3.** Furthermore, the court finds that Ogilvie has waived any objections regarding the alleged inconsistency. Following the reading of the verdict, the court granted Ogilvie's request for additional time during which to study the verdict in order that Ogilvie could object to any inconsistencies. After carefully reviewing the verdict of the jury, Ogilvie did not make any such objections prior to the discharge of the jury.

requisite elements proving a violation of the Lanham Act and its state tort claims.

Before addressing the merits of Ogilvie's motion for judgment as a matter of law, the court will review the factual background giving rise to the claimed inventions of the patent claims-in-issue. The carbonless copy paper industry has been in existence since at least the early 1960s. During the early periods of the industry, carbonless copy paper was manufactured using Solka–Floc as the primary stilt material. By 1970, the primary stilt material employed in the manufacture of carbonless copy paper was arrowroot starch which was grown and produced only on the island of St. Vincent located in the West Indies. Arrowroot starch was used in the carbonless copy paper industry because of its uniform particle size which is large enough to serve as a stilt material.

In early 1971, a shortage of arrowroot starch arose. The evidence produced at trial revealed that arrowroot growers had stopped producing arrowroot starch during the years immediately preceding the shortage due to a history of large surpluses which resulted in extremely low prices and narrow profit margins. However, in early 1971, the arrowroot surplus was exhausted and it became apparent to the St. Vincent Arrowroot Association that they would not be able to meet the immediate demands of the manufacturers who supplied the carbonless copy paper industry with arrowroot starch. *See* Trial Exhibit 106. Upon receiving this formal notice on February 26, 1971, or immediately prior thereto, A.E. Staley ("Staley"), the original patent holder, set about finding a suitable substitute. Within a few weeks, Staley had produced fractionated large-granule wheat starch which it offered to its carbonless copy paper customer, National Cash Register ("NCR"), as a suggested substitute stilt material.

### 1. Patent Validity

With respect to its claims that the jury's verdict of invalidity must be set aside, Ogilvie contends that Manildra's entire defense of patent invalidity was based upon Manildra's allegations that the inventions de-

scribed by the patent claims were either obvious or were anticipated by "prior art" thereby rendering the patents invalid under 35 U.S.C. §§ 102 and 103. Ogilvie contends that it is entitled to judgment of validity as a matter of law on these claims.

Among the basic elements required for an alleged invention to be patentable are that the invention disclose something "new" or "novel" and that the claimed invention is "non-obvious" to a person having ordinary skill in the pertinent art at the time the invention was made. *See* 35 U.S.C. §§ 102 and 103. On these issues, as well as all other attacks on the validity of a patent, the challenger must establish invalidity by evidence which is clear and convincing. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). Also factored into this equation is the statutory presumption of validity. *See* 35 U.S.C. § 282. *Hybritech, Inc.*, 802 F.2d at 1375.

In determining whether a claimed invention is obvious, various inquiries must be made. These include: the scope and content of the prior art; differences between the prior art and the claimed invention; and the level of ordinary skill in the pertinent art. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). Other factors which are to be considered, known as "secondary factors" or objective evidence of obviousness or non-obviousness, include: commercial success, long-felt but unsolved need, failure of others in attempting to invent a similar product or process, etc. *Id. Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed.Cir.1983). Evidence of secondary considerations is frequently the "most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not." *Id.*, at 1538.

Based upon a careful review of the evidence admitted at trial, and in view of the statutory presumption of validity and the prohibition of using hindsight to read the invention into the prior art, the

court finds that substantial evidence supports the jury's finding of invalidity of the patent claims-in-issue on the basis of obviousness and for lack of novelty of claims 24–27 of the '725 patent.

### a. The Invention

The patent claims-in-issue of United States Patent 3,901,725 ("'725 patent"), claims 1, 2, 3, 8, 9, 10, 16, 17, 18, 19, 24, 25, 26 and 27, teach the fractionation of bimodal cereal starch (including wheat starch) into two monomodal fractions containing primarily large-granule or small-granule starch particles. The process and product taught by the claims-in-issue involve a wet process employing hydrocyclone separating devices in two distinct steps. The first step begins with the input of prime grade wheat starch which has been washed and is substantially free of gluten and fiber.[4] This prime grade wheat starch is injected into the first set of hydrocyclones producing an overflow containing primarily small starch particles and an underflow consisting mostly of large starch particles. *See* Trial Exhibit 902. The underflow is then recycled through another set of hydrocyclones and once again the underflow is collected. The underflow consists of classified large-granule wheat starch particles of relatively uniform size which are well suited for use as a protective coating in the manufacture of carbonless copy paper.

The patent claims-in-issue of United States Patent 4,280,718 ("'718 patent"),

claims 1, 6, 7, 8, 9 and 10, involve the application of the large-granule starch product produced by the wet separation process claimed in the '725 patent as a protective coating on carbonless copy paper. Thus, this patent claims the invention of a "new use" for large-granule cereal starch.

### b. Prior Art

The patents-in-suit had a long and tortuous path before their issuance. Indeed, various claims of the '725 patent had been rejected on at least one occasion by the Patent Examiner on grounds of obviousness in view of a patent, namely the Fontein Patent, United States Patent 2,642,-185,[5] issued on June 16, 1953, which claimed the use of hydrocyclones in a wet separation process to obtain various subfractions of starch particles based upon particle size.[6] Trial Exhibit 861. Thus, from the outset, the issuance of the claims-in-issue involved close questions which were ultimately resolved in favor of the applicants.

 While much of the prior art which was introduced during the trial had been considered by the patent office, other relevant prior art had not. Therefore, the court finds no merit in Ogilvie's contention that the only pertinent prior art relied upon by Manildra in seeking the invalidation of Ogilvie's patents had already been considered and rejected by the patent examiners as invalidating prior art.[7] Specifically,

---

4. In this regard, highly conflicting testimony, which now must be viewed in favor of Manildra, was offered from various witnesses regarding whether it was common knowledge in the cereal starch industry to start with a prime starch feed which was critical to the invention claimed in the '725 patent.

5. The goal of the Fontein Patent was to separate or refine cereal starch on the basis of particle size. The primary objective of the Fontein Patent was to "provide a method requiring a minimum of control and space which may be operated in a continuous manner to prepare high grade starch from wheat starch." Trial Exhibit 861.

6. In order to overcome the Patent Examiner's rejection of the '725 patent claims of hydrocy-

clonic fractionation of wheat starch, the patent applicants represented to the Patent Examiner the critical nature of the size limitations added to the claims-in-issue of the '725 patent. They also asserted the alleged "inventive concept" of beginning the classification process with a clean starch stream which is "substantially free of gluten and fiber." Based upon these two representations, the Patent Examiner ultimately allowed the patent claims-in-issue.

7. Furthermore, the court notes that the validity of a patent obtained in *ex parte* proceedings before the PTO, can be challenged in court. *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1564 (Fed.Cir.), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988). While patents are presumptively valid, they are not conclusively valid and unchallengeable. *Id.*

the court finds that an article published by Dr. W.T. Yamazaki, was not considered by the patent examiner as prior art. Trial Exhibit 1344. This publication revealed that wheat starch could be classified or fractionated into monodisperse large and small-granule fractions. Although Dr. Yamazaki's article discussed an air centrifugation process, the article, nevertheless, reveals or teaches that wheat starch can be separated into subfractions of fairly uniform particle size which is important for its utilization in the carbonless copy paper industry.[8] This publication disclosed a subfraction of large-granule wheat starch of relatively uniform particle size identical or similar to that of the large-granule starch particles claimed by the '725 patent.[9] Compare Trial Exhibit 1344, at 79, Fig. D with Trial Exhibit 902, Figure 4. Substantial evidence was admitted into trial that Dr. Yamazaki's large-granule wheat fraction met the critical size limitations defined in the patent claims-in-issue.

Moreover, Dr. Yamazaki's work with regard to large-granule wheat starch is not secret prior art because he did not abandon, suppress or conceal, his work and its accomplishments. *See* 35 U.S.C. § 102(g); *E.I. DuPont de Nemours and Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1437 (Fed.Cir.), *cert. denied*, 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988). The evidence supports a contrary conclusion. The record reflects that Dr. Yamazaki had publicly disclosed his large-granule wheat fraction in Trial Exhibit 1344 by presenting his paper at an annual conference.

### c. Differences from Prior Art
#### 1. '725 Patent

None of the pertinent prior art discloses the wet separation of a monomodal large-granule wheat fraction through the use of hydrocyclones beginning with a prime starch feed disclosed in the '725 patent.[10] However, the Fontein Patent does teach the wet separation of various subfractions of wheat starch through the use of hydrocyclones in repeated cycles. One of the main distinctions between the Fontein Patent and the patent claims-in-issue of the '725 patent, is that the objective of the Fontein Patent was to obtain a fine or small-particle size fraction whereas the '725 patent seeks to obtain a large-granule fraction. In order to obtain these different objectives, the Fontein Patent teaches the recycling of the overflow, while the '725 patent teaches the recycling of the underflow.

In contrast, the Yamazaki prior art, Trial Exhibit 1344, does not teach a wet separation process through the use of hydrocyclones. Rather, once prime starch is obtained by wet separation and sieving, the prime starch fraction is then air-dried and later subjected to a series of separations or fractionation via air classification. The large-granule subfraction, S–6208, which was ultimately obtained after numerous

---

**8.** Furthermore, Ogilvie's contention that Dr. Yamazaki's work did not constitute prior art because it was inoperable does not have any merit with respect to this court's consideration of his article as prior art for a determination of obviousness. *In re Shepherd*, 172 F.2d 560, 564 (CCPA 1949). Indeed, an inoperative or unworkable device or patent is part of the prior art for all that it teaches. *See* generally 2 Chisum, *Patents* § 5.03[3] at 5–113, n. 22 (citing numerous such holdings). In any event, the jury presumptively found that the classification process described by Dr. Yamazaki's paper was operable.

**9.** This prior art reference anticipates Ogilvie's product claims in the '725 patent, *i.e.*, claims 24 through 27, and serves as a statutory bar to patentability pursuant to 35 U.S.C. § 102(b) because this work was performed more than twelve months prior to the filing of the patent

application. In this regard, it is irrelevant whether Dr. Yamazaki realized the utility of large-granule wheat starch. *See In re Shoenwald*, 964 F.2d 1122 (Fed.Cir.1992) ("it is beyond argument that no utility need be disclosed for a reference to be anticipatory of a claim to an old compound."); *In re Donohue*, 632 F.2d 123, 126 n. 6 (CCPA 1980) ("proof of utility is not a prerequisite to availability of a prior art reference under 35 U.S.C. § 102(b)").

**10.** As previously discussed, *supra*, at note 4, whether it was common knowledge to those skilled in the art to start with a "clean starch stream" was highly disputed. Now, viewing the evidence and reasonable inferences therefrom in the light most favorable to Manildra, the court concludes it would have been obvious to one of ordinary skill in the art to begin with a clean starch stream when attempting to further refine starch into various fractions.

passes, met the particle size limitations contained in claims 24 through 27 of the '725 patent.[11]

Another Yamazaki publication, Trial Exhibit 2901, teaches the wet classification of various bimodal cereal starches, including wheat starch, by the use of a series of sieving devices or by air eleutriation in order to obtain a monodisperse particle size fraction. The process described in this article begins with a deproteinized starch sample. The prime starch is then passed through a series of sieves until various subfractions are obtained.

### 2. '718 Patent

With regard to the application of large-granule wheat starch in the carbonless copy paper industry, Manildra asserted the NCR Patent as invalidating prior art. The NCR patent discloses the use of cereal starches in combination with a binding material as a suitable coating in the manufacture of carbonless copy paper. The NCR Patent teaches that cereal starch is a superior stilt material over artificial stilt materials such as microscopic glass beads. The NCR Patent discloses a list of unfractionated cereal starches, including wheat starch, and describes their particle size distributions. The NCR Patent also rates their effectiveness as a suitable stilt material. Trial Exhibit 948, at 3, line 85. Unclassified wheat starch was rated below arrowroot, potato and sago starch. The NCR Patent further teaches that uniformity in particle size is the requisite requirement for suitable stilt material, arrowroot possessing this quality in an unfractionated state.

In contrast, the '718 claims-in-issue, claims 1, 6, 7, 8, 9 and 10, teach the use of fractionated large-granule cereal starch (selected from wheat, barley and rye which naturally have a bimodal particle size distribution) obtained by wet separation in the manufacture of the carbonless copy paper. These claims also cover the use of a large-granule cereal starch possessing specific

characteristics in particle size and other parameters as applied to the surface of carbonless copy paper. Trial Exhibit 948.

#### d. Level of Ordinary Skill

A person of ordinary skill in the art is "one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights...." *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 458 (Fed.Cir.1985). "Reference to the educational background and experience of those actively involved in the art is proper in determining the level of skill." *Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1566 (Fed.Cir.1984). Other factors which may be considered include: (1) the educational level of the inventors; (2) the types of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field. *Environmental Designs, Ltd. v. Union Oil Co. of Calif.*, 713 F.2d 693, 696 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984) (citation omitted).

Based upon the testimony received during trial, one of ordinary skill in the art at the time of the claimed invention would have been an individual with at least a bachelors degree in a technologically relevant area such as chemistry, grain science, or chemical engineering and with several years experience in the starch refining industry or a closely related industry. Many of the numerous witnesses presented at trial by both sides, including some of the named inventors, expert and fact witnesses, had this type of background. As such, the ordinary level of skill may be properly characterized as high and extremely technical.

---

11. In this regard, Dr. Yamazaki's work described in Trial Exhibit 1344 was reduced to practice as demonstrated by his sample of S-6208, which was introduced at trial as Trial Exhibit 1359. Further, this reference, Trial Exhibit 1344, was enabling because it describes in relative detail how to obtain the large-granule starch fraction.

### e. Secondary Considerations of Obviousness

Among the secondary considerations which must be considered when determining whether an invention is obvious are commercial success, longfelt but unsolved need, and the failure of others, etc. *Graham*, 383 U.S. at 17, 86 S.Ct. at 693. Applying these factors to the evidence presented at trial leads to the conclusion that substantial evidence supports the jury's conclusion of invalidity on grounds of obviousness.

As previously recited above, the need for a substitute stilt material was not a longfelt but unsolved need. Prior to early 1971, an adequate supply of arrowroot starch was available to the producers of carbonless copy paper, and before that, Solka–Floc was used as a stilt material. Within only a month of learning that its only source of arrowroot starch had disappeared, A.E. Staley found a suitable substitute. Thus, although the technology existed for many years in the starch industry to refine or classify cereal starch into various subfractions, including large granule fractions, there was no incentive to classify large granule particles because there was no use for such monomodal large granule cereal starch. Accordingly, viewing the inferences in favor of the nonmoving party, substantial evidence supports the conclusion that the claimed inventions were obvious solutions to a new problem. *See* Chisum, 2 *Patents* § 5.05[1], at 5–399 n. 7, (for a list of citations addressing situations where the inventor's solution is an obvious response to a new problem created by changes in the market). Furthermore, the NCR Patent teaches that cereal starch of uniform particle size is the best type of stilt material. The NCR patent also teaches the use of wheat starch as a potential source of stilt material. In view of this prior art, the invention of the '718 patent, *i.e.*, use of a monomodal large-granule cereal starch as a stilt material, would have been obvious to one skilled in the art at the time of the alleged invention.

With respect to commercial success, there is no question that Ogilvie's fractionated large-granule wheat starch has met with significant commercial success in the carbonless copy paper industry. However, the record also supports the conclusion that the unique situation confronted by the carbonless copy paper market is largely responsible for the commercial success of the classified large-granule wheat starch product. As stated previously, the carbonless copy paper industry was a preexisting market which suddenly lost its only supply of cereal stilt material. Thus, the commercial success of this product was largely the result of a preexisting built-in market with no other alternatives.

With respect to the failure of others, the record is highly conflicting. Substantial evidence exists in the record that Mid-west Grains (f/k/a Midwest Solvents) produced a sample of fractionated wheat starch within a short time after being asked to come up with a sample of classified wheat starch. Other than this, there is no record that others tried and failed to find a solution to the shortage of arrowroot starch as a stilt material. The jury presumptively resolved this disputed area in favor of Manildra.[12]

Careful examination of all of the above factors leads the court to conclude that substantial evidence, indeed evidence arising to the level of being clear and convincing, exists to support the jury's conclusion that the claimed inventions are invalid on the basis of obviousness, as well as lack of novelty of claims 24–27 of the '725 patent. The technology to fractionate bimodal cere-

---

12. Other factors which are relevant include licensing of the invention or acquiescence in the industry, copying, acclamation of the invention and simultaneous invention by others. Evidence presented during the trial relevant to these factors was highly conflicting. For example, testimony was presented that Midwest had produced a large-granule wheat starch product prior to its obtaining a license from Ogilvie's predecessor for a relatively modest price of approximately $300,000. Prior to receiving this license, inquiries of infringement had been directed at Midwest. Whether Midwest accepted the validity of the patents, or whether it purchased a license to avoid any litigation regarding the patents-in-suit, was unclear. In view of the undoubtedly high cost of this litigation, it appears that Midwest made a wise choice.

al starch existed since the 1950s; however, there simply was no demand for a monodisperse large-granule cereal starch product. Rather, the valuable subfractions of starch were those consisting of smaller particle sizes. The process for obtaining a large-granule cereal starch was an obvious modification of the Fontein Patent. Further, evidence which the jury found credible supports the conclusion that it would have been obvious to those skilled in the art to begin with a clean starch stream, *i.e.*, deproteinized starch stream, substantially free of gluten and fiber, at the time of the alleged inventions. These factors combined with the high level of skill in the pertinent art and the nature of the problem presented to the starch industry and carbonless copy paper industry, lead the court to conclude that it would have been obvious to one skilled in the art of starch refining to combine the various references to obtain a cereal starch product which is similar to arrowroot in particle size and distribution which would serve as a suitable substitute stilt material for arrow root starch.[13]

### 2. Infringement of the Patent Claims-in-Issue

 Ogilvie also moves for judgment as a matter of law on the issue of infringement. Infringement is an issue of fact to be decided by the jury. *Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*, 872 F.2d 978, 986 (Fed.Cir.1989); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1269–70 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987). On this issue, Ogilvie bears the burden to prove by a preponderance of the evidence that Manildra and Honan have infringed the patent claims-in-issue. *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1574 (Fed.Cir.1991).

 In the interest of economy, the court finds that much evidence was presented on this issue both supporting a

finding of infringement and supporting a conclusion of non-infringement. The jury chose to believe the evidence supporting non-infringement. This court cannot say as a matter of law, considering all inferences in the favor of the nonmoving party, that Ogilvie was entitled to a judgment on the issue of infringement. Specifically, the court finds that evidence was presented that Manildra's product did not literally infringe, or read on the claims of the patent claims-in-issue because Manildra's product does not fall within the size limitations contained in the relevant patent claims. Further, with respect to Ogilvie's contentions that it is entitled to judgment as a matter of law on the issue of infringement under the doctrine of equivalents, the court finds that the jury was properly instructed on the elements of the infringement under the doctrine of equivalents, *i.e.*, that the infringing device performs substantially the same function, in substantially the same way to achieve substantially the same result. *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1325 (Fed.Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 2942, 119 L.Ed.2d 566 (U.S.1992); *Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan*, 873 F.2d 1422, 1425–26 (Fed.Cir.1989). Substantial evidence was presented during trial that Manildra's product was produced through air classification, thus, failing the second prong of the equivalency test as it relates to the process and product-by-process claims-in-issue. Further, the court finds that substantial evidence supports the jury's conclusion that Manildra's large-granule wheat product does not infringe the product claims-in-issue under the doctrine of equivalents in view of the prosecution history of the patent claims.

The court further finds that evidence was presented supporting the giving of an instruction on the reverse doctrine of

---

**13.** With regard to Manildra's contentions of invalidity of the specific claims-in-issue on the basis of vagueness in violation of 35 U.S.C. § 112, the court finds that this was a heated point of controversy on which wide ranging testimony was introduced. Indeed, the testimony was simply irreconcilable. Expert testimony was introduced by both sides regarding whether one of ordinary skill in the art would have known precisely what was intended with the use of the term "about" as it was employed in the patent claims in view of the applicants' use of this term in their patent specifications.

equivalents. As previously stated, evidence supporting literal infringement was introduced during the trial, as was evidence that Manildra's alleged infringing product was produced in a significantly different manner. Thus, the underlying factual prerequisites for an instruction of the reverse doctrine of equivalents were introduced during the case. Accordingly, the court finds that it was proper to instruct upon this doctrine.

### 3. Lanham Act and Pendent State Tort Claims

The court has carefully reviewed and considered Ogilvie's contentions, the evidence admitted at trial and the applicable law, and finds that in viewing all of the evidence and inferences in the light most favorable to Manildra, substantial evidence exists in the record to support the jury's conclusion that Ogilvie violated the Lanham Act. The court further finds that substantial evidence exists to support the jury's conclusion that the defendant interfered with Manildra's prospective economic advantage and that it committed unfair competition in the form of injurious falsehood.

Specifically, the court finds that the record contains evidence that Ogilvie continued to make representations which were originally made by its predecessor patent owner, Henkel, such representations which led potential purchasers of large-granule wheat starch to avoid doing business, or to limit their purchases from Manildra due to the threat of being brought into patent infringement litigation. Furthermore, the court finds that plaintiff was not allowed to create the erroneous impression that Ogilvie should be held responsible for the conduct of the Henkel Corporation. The court gave a very specific limiting instruction on this issue. See Instruction 24a.[14] Furthermore, while presiding over four and one-half months of testimony, the court did not observe any abuse by Manildra with respect to the limited admissibility of evidence regarding conduct of the Henkel Corporation.

Additionally, the court finds that the record contains evidence upon which the jury could have concluded that Ogilvie did not investigate whether Manildra's large-granule wheat starch actually infringed Ogilvie's patents and that Ogilvie possessed test data revealing that Manildra's product did not infringe the patent claims-in-issue. Thus, the court finds that substantial evidence was presented upon which the jury could have based a finding of malice on the part of the defendant. On the issue of causation of Manildra's small market share, evidence was presented that Manildra had the lowest price and a good quality product, and yet, was unable to increase its market share among carbonless copy paper manufacturers. In addition, evidence was presented that carbonless copy paper manufacturers had represented to Manildra their reluctance to enter into contracts or to purchase large quantities of large-granule wheat starch from Manildra due to the threat of patent litigation. Thus, evidence was presented from which the jury could infer that Manildra's damages (lost sales) resulted from Ogilvie's representations regarding its patents and Manildra's alleged infringement. Finally, the court finds that Ogilvie's remaining contentions regarding insufficient evidence are without merit.

### C. Remittitur

Ogilvie next contends that the jury's verdict of $2,250,000 compensatory damages and $2,500,000 in punitive damages is excessive, against the weight of the evidence, and the product of improper passion and prejudice on the part of the jury.

In evaluating a motion for remittitur, the court must examine the verdict to determine whether the jury award is "so excessive that it shocks the judicial conscience or leads to an inescapable inference that it resulted from improper passion or prejudice on the part of the jury." *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152, 1177 (10th Cir.1981), *cert. denied*, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983). Whether to

14. Manildra complains this instruction is too limiting.

grant remittitur is within this court's sound discretion.

The court has fully considered Ogilvie's contentions regarding the size of the verdict, the evidence presented at trial, and the applicable law. The court finds Ogilvie's motion for remittitur should be denied. Although the damages awarded by the jury are significant, the damages awarded are well within estimates presented during trial through expert testimony based upon underlying data involving Manildra's product, profit margin, the large-granule wheat starch market, and other economic and financial indices. Finally, the court finds the jury's award of $2,500,000 in punitive damages is reasonable in view of the actual damages found to have been sustained, the relative positions of the parties, and the financial resources of Ogilvie. Accordingly, the court will deny Ogilvie's motion for remittitur.

## II. MANILDRA'S POST–TRIAL MOTIONS

Manildra moves the court to amend the judgment to award Manildra Ogilvie's profits from its sales of large-granule wheat starch or to treble the damages awarded by the jury pursuant to 15 U.S.C. § 1117(a). Manildra also seeks an award of attorneys' fees pursuant to 15 U.S.C. § 1117(a), 35 U.S.C. § 285, and 28 U.S.C. § 1927. Finally, Manildra moves the court for a partial new trial on its antitrust claims.

Title 15, United States Code, Section 1117(a) allows a prevailing party to recover, subject to the principles of equity, (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. Section 1117(a) also allows the court, in exceptional cases, to award the prevailing party reasonable attorney fees. However, any award must constitute compensation and not serve to penalize the losing party.

As the prevailing party under 15 U.S.C. § 1117(a), the court finds that Manil-

dra is entitled to recover its actual damages sustained, *i.e.*, $2,250,000, and its costs of the action. The court finds such an award to be just in view of the evidence presented during trial regarding Manildra's lost profits and injury to its reputation. With respect to Ogilvie's request that Manildra's costs be apportioned so that Manildra may recover only those costs related to its Lanham Act claim, the court finds that no apportionment is warranted. The court bases this finding upon the fact that all of Manildra's claims centered upon the same issues which had to be proven in order to establish violations of the Lanham Act. In order to recover under the Lanham Act, Manildra had to prove that Ogilvie had made false representations of fact about its large-granule wheat starch and Manildra's large-granule wheat starch; Manildra had to establish by clear and convincing evidence that the patent claims-in-issue were invalid, or that the patents were unenforceable.[15] Thus, the court finds Manildra's claims were so "tightly bound" together, that the same work was necessary for all of Manildra's affirmative claims. Thus, the court concludes no apportionment of costs is warranted.

With respect to Manildra's request that it be awarded enhanced damages in the form of Ogilvie's profits or by the court's trebling of the jury's award of actual damages, the court finds that the award of actual damages made by the jury is an adequate and just amount. Thus, the court will not increase Manildra's damages, nor will it order an accounting of Ogilvie's profits. The court further finds that any increased or enhanced damages would serve to penalize Ogilvie which is an impermissible reason to enhance the damages award under the Lanham Act. *See* 15 U.S.C. § 1117(a).

In determining whether this is an exceptional case warranting the award of attorneys' fees, under the Lanham Act, "exceptional" cases involve those situations where the wrongful conduct may be characterized

---

15. In the alternative, Manildra had to establish by a preponderance of the evidence that the patent claims-in-issue were not infringed.

as "wilfull," "malicious," "fraudulent," or "deliberate." *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 528 (10th Cir.1987); *VIP Foods, Inc. v. Vulcan Pet, Inc.*, 675 F.2d 1106, 1107 (10th Cir.1982). Similarly, under the patent laws, 35 U.S.C. § 285, the court may award reasonable attorneys' fees to the prevailing party in "exceptional" cases. Section 285 is meant to "provide discretion where it would be *grossly unjust* that the winner be left to bear the burden of his own counsel which prevailing litigants normally bear." *Badalamenti v. Dunham's, Inc.*, 896 F.2d 1359, 1364–65 (Fed.Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 142, 112 L.Ed.2d 109 (1990) (quoting *J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.*, 822 F.2d 1047, 1052 (Fed.Cir.1987) (emphasis in original)). There must be some finding of unfairness, bad faith or inequitable conduct on the part of the unsuccessful patentees. *Id.* (citation omitted).

 Applying the above tests to Manildra's motion for attorneys' fees, the court finds that Manildra should be awarded attorneys' fees under either provision. There is no question in this court's mind that this case is exceptional or extraordinary in terms of the costs to the parties, the government and all other persons who were even remotely involved.[16] However, the inquiry which this court must focus on in determining whether to award attorneys' fees involves an inquiry into whether this case is "exceptional" in view of the patent laws or the Lanham Act.

Upon reviewing the verdict entered by the jury and considering the evidence presented at trial, the court finds that this case is an exceptional case warranting the award of attorneys' fees to Manildra as the prevailing party. In reaching its verdict that Ogilvie had committed unfair competition in the form of injurious falsehood, and that Ogilvie had intentionally interfered with Manildra's prospective economic ad-

vantage, the jury presumptively found that Ogilvie's conduct was intentional and malicious. *See* Instruction Nos. 34 and 41. Because the Lanham Act is essentially a federally codified version of unfair competition, the court finds the jury's verdict to be sufficient to warrant a finding that Ogilvie's violation of the Lanham Act was wilfull or intentional, thereby rendering this case exceptional within the meaning of 15 U.S.C. § 1117(a). Accordingly, the court finds that Manildra is entitled to recover attorneys' fees under Section 1117(a) of the Lanham Act. Similarly, the court finds that such a finding of intentional or malicious conduct is the equivalent of a finding of bad faith, thereby warranting an award of attorneys' fees under the 35 U.S.C. § 285. Accordingly, the court finds that Manildra is entitled to recover reasonable attorneys' fees in litigating this action.[17] The court further finds that Manildra is entitled to recover reasonable expert witness fees because the use of expert witnesses in this case was necessary. *Mathis v. Spears*, 857 F.2d 749, 759 (Fed.Cir.1988).

Finally, the court finds no merit in Manildra's motion for a partial new trial on its antitrust claims. The court correctly instructed upon the elements of Manildra's antitrust claims in the context of the patent laws of the United States. *See* Instructions 24, 26, 30 and 31. Moreover, the court finds that Manildra has waived any objections to the "double-hurdle" nature of the instructions relating to its antitrust claims. The first time this objection was brought to the court's attention was during jury deliberations. Nor does the court find merit in Manildra's allegations that Instruction 24a impermissibly limited the jury's consideration of the conduct of Ogilvie's predecessor patent owner.

### III. OGILVIE'S MOTION TO CORRECT INVENTORSHIP.

Ogilvie has requested that the court rule on its motion to correct inventorship. This

---

**16.** The court notes that a jury of nine people dedicated six months of their lives to this case.

**17.** The court finds Manildra's request for attorneys' fees under 28 U.S.C. § 1927, to be without merit. While it is true that this was an extremely hard fought battle in which both sides inter-

ests were zealously pursued, the court does not find Ogilvie's counsel to have vexatiously or unreasonably multiplied the proceedings in this case. Accordingly, the court will deny Manildra's request for an assessment of attorneys' fees under 28 U.S.C. § 1927.

motion was first presented to the Honorable Earl E. O'Connor, then Chief United States District Judge. Upon consideration, Judge O'Connor deferred ruling on this motion and took it under advisement pending trial. While the court finds that the omission of Dennis M. Adkesson as an inventor to U.S. Patents 3,901,725, 3,951,948 and 4,280,713 and the omission of Donald L. Johnson as a named inventor in U.S. Patents 3,901,725 and 3,951,948 were errors of oversight which occurred without deceptive intent, the court finds that this motion is now moot as it relates to the patent claims-in-issue. *See Garrett Corp. v. United States*, 422 F.2d 874, 881 n. 5, 190 Ct.Cl. 858 (1970), *cert. denied*, 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257 (1970); *Long Mfg. N.C., Inc. v. Condec Corp.*, (unpublished slip op. Case No. Civ. A 79–93–Civ.–7) (filed June 21, 1984) 1984 WL 1351, 223 U.S.P.Q. 1213. Accordingly, the court will deny Ogilvie's motion to correct inventorship as moot.

## IV. OTHER MATTERS

The court has carefully considered Ogilvie's and Manildra's motions for sanctions and finds that both motions should be denied. Further, the court finds that both parties' motion to amend and clarify the judgment to more clearly reflect the jury verdict, *nunc pro tunc*, should be denied, except that the court will direct the clerk to amend the judgment *nunc pro tunc* to reflect the jury's verdict with respect to validity and infringement of the patent claims-in-issue, and to the extent that defendant and counterclaimant John Thomas Honan should not have been awarded any recovery.

IT IS BY THE COURT THEREFORE ORDERED that Manildra's motion to amend judgment pursuant to 15 U.S.C. § 1117(a) (Doc. 1088) is denied.

IT IS FURTHER ORDERED that Manildra's motion to award reasonable attorneys' fees, expenses and costs (Doc. 1089) is granted. Manildra is directed to submit to the court an affidavit detailing its attorneys' fees and expert witness fees, within sixty (60) days of the date of this order, in lieu of a hearing on this issue. Ogilvie is given twenty (20) days after receipt of the service of the affidavit to file with the court and serve on Manildra any objections to the expenses and fees detailed in the affidavit.

IT IS FURTHER ORDERED that Manildra's motion for a new trial on Manildra's antitrust claims (Doc. 1090) is denied.

IT IS FURTHER ORDERED that Manildra's motion to amend and clarify the judgment *nunc pro tunc* (Doc. 1092) is granted in part, and denied in part.

IT IS FURTHER ORDERED that Ogilvie's renewed motion for judgment as a matter of law (Doc. 1094) is denied.

IT IS FURTHER ORDERED that Ogilvie's motion for a new trial (Doc. 1096) is denied.

IT IS FURTHER ORDERED that Ogilvie's motion to amend the judgment (Doc. 1100) is granted in part, and denied in part.

IT IS FURTHER ORDERED that Ogilvie's request for a ruling on its motion to correct inventorship (Doc. 1102) is denied, as is the underlying motion (Doc. 282).

IT IS FURTHER ORDERED that Ogilvie's motion for remittitur (Doc. 1104) is denied.

IT IS FURTHER ORDERED that Ogilvie's motion for sanctions (Doc. 807) is denied.

IT IS FURTHER ORDERED that Manildra's motion for sanctions (Doc. 984) is denied.

IT IS FURTHER ORDERED that the clerk enter judgment *nunc pro tunc* on the jury's verdict on which judgment was originally entered on February 27, 1992, as follows:

The patent claims-in-issue are declared and adjudged to be invalid and non-infringed. Judgment is entered in favor of plaintiff and counterclaim defendant Manildra Milling Corporation in the sum of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00) in actual damages; and Two Million Five Hundred Thousand Dollars ($2,500,000.00) in puni-

tive damages, with interest at the rate of 4.21% as provided by law.

IT IS FURTHER ORDERED that the clerk is directed to certify this judgment as final between Manildra Milling Corporation, John Thomas Honan, and Ogilvie Mills, Inc.