1 F.3d 1253
 30 U.S.P.Q.2d 1012
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
MANILDRA MILLING CORPORATION, Plaintiff/Cross-Appellant,
v.
OGILVIE MILLS, INC., Defendant-Appellant,
v.
Henkel Corporation and Henkel of America, Inc., Third-Party Defendants,
and
John Thomas Honan, Counterclaim Defendant.
 Nos. 92-1462, 92-1480.
 United States Court of Appeals, Federal Circuit.
 June 22, 1993.
Order Revising Opinion on Denial of
Rehearing Sept. 20, 1993.
 
 Before RICH, MICHEL and CLEVENGER, Circuit Judges.
 CLEVENGER, Circuit Judge.
 
 
 1
 Ogilvie Mills, Inc. (Ogilvie) appeals from the June 15, 1992 judgment of the United States District Court for the District of Kansas,[1] entered on the basis of a jury verdict, holding, inter alia, claims 1-3, 8-10, 16-19 and 24-27 of U.S. Patent No. 3,901,725 and claims 1, 6-10 and 12-14 of U.S. Patent No. 4,280,718 invalid and not infringed by Manildra Milling Corporation (Manildra), and Ogilvie liable under section 43(a) of the Lanham Act and the Kansas state law causes of action for tortious interference with prospective economic advantage and injurious falsehood. We affirm-in-part, reverse-in-part, vacate-in-part and remand.
 
 
 2
 * U.S. Patent No. 4,280,718 ('718 patent), entitled "Pressure Sensitive Recording Sheet Containing Size Classified Cereal Starch Granules," issued on July 28, 1981 to Johnson et al., who assigned their rights to Henkel Corporation (Henkel). It is directed to the use of fractionated large granule wheat starch (LGWS) as a stilting material in carbonless copy paper (CCP)[2] to prevent premature rupture of fragile dye microcapsules through casual contact with the layered paper.
 
 
 3
 U.S. Patent No. 3,901,725 ('725 patent), entitled "Size Classified Cereal Starch Granules," issued on August 26, 1975 to Bond et al., who assigned their rights to A.E. Staley Manufacturing Company (Staley). Henkel purchased Staley's rights in the '725 patent in November 1978. It is directed both to the process for producing LGWS from a clean starch feed through hydroclassification,[3] and to the LGWS itself.
 
 
 4
 Both patents at issue in this case originate from, and trace their prosecution histories to, the same parent patent application, No. 180,588, filed by Staley in September 1971, and are each the result of a restriction requirement made in the original application by the Patent Office. Ogilvie, a subsidiary of Ogilvie Mills, Ltd. and a legal entity unaffiliated with Henkel, was incorporated in January 1985 and immediately acquired all rights in both the '718 and '725 patents through an arms-length transaction with Henkel.
 
 
 5
 In October 1986, Manildra filed a declaratory judgment action seeking a declaration that Ogilvie's patents were invalid and not infringed. Manildra also asserted a claim for damages against both Ogilvie and Henkel,[4] respectively the present and prior owners of the patents, for violation of the federal antitrust laws, unfair competition under section 43(a) of the Lanham Act, and both tortious interference with prospective economic advantage and injurious falsehood under Kansas law. Ogilvie counterclaimed for willful infringement against both Manildra and its owner, Honan.
 
 
 6
 After a lengthy trial,[5] the jury found by special verdict, inter alia, that (i) the patent claims in suit were invalid; (ii) the patent claims were not infringed, either literally or under the doctrine of equivalents; (iii) Ogilvie had not violated the federal antitrust laws; and (iv) Ogilvie had not misused its '718 patent; but (v) Ogilvie was liable to Manildra (1) under section 43(a) of the Lanham Act; and (2) for both tortious interference with prospective economic advantage and injurious falsehood. In accordance with its verdict, the jury awarded Manildra $2,250,000 in actual damages and $2,500,000 in punitive damages.
 
 
 7
 The court subsequently denied Ogilvie's post-trial motions for judgment as a matter of law (JMOL) on all adversely-decided issues, for a new trial on those same issues, and for remittitur of the damages. The court also denied Ogilvie's request for a ruling on its motion to correct inventorship under 35 U.S.C. Sec. 256 (1988) and Manildra's motions, inter alia, for a new trial on the antitrust claim and enhanced damages. The court, however, granted Manildra's motion for reasonable attorney fees, having found that the case was "exceptional" under either 35 U.S.C. Sec. 285 (1988) or 15 U.S.C. Sec. 1117(a) (1988). Ogilvie appeals from the district court's denials of its post-trial motions and Manildra cross-appeals from the denial of its motion for a new trial on its antitrust claim.[6]
 
 II
 
 8
 In order to overturn a judgment entered on the basis of a jury verdict, the party against whom the judgment was rendered must demonstrate either that "the jury's findings [on disputed material factual issues], presumed or express, are not supported by substantial evidence, ... [or] if they [are so supported], that the legal conclusion(s) implied from the jury's verdict cannot in law be supported by those findings." Read Corp. v. Portec, Inc., 970 F.2d 816, 821, 23 USPQ2d 1426, 1431 (Fed.Cir.1992); Verdegaal Bros., Inc. v. Union Oil Co., 814 F.2d 628, 631, 2 USPQ2d 1051, 1052 (Fed.Cir.), cert. denied, 484 U.S. 827 (1987). Rather than directly reviewing the jury's verdict, we instead review the trial court's denial of a renewed motion for JMOL under Rule 50(b) of the Federal Rules of Civil Procedure, and must decide
 
 
 9
 for ourselves whether reasonable jurors viewing the evidence as a whole could have found the facts needed to support the verdict in light of the applicable law. If we conclude that no reasonable findings of fact, supported by substantial evidence, could support the verdict that was incorporated into the trial court's judgment, then we must conclude that the trial court erred in not granting the motion for [JMOL].
 
 
 10
 Lemelson v. General Mills Inc., 968 F.2d 1202, 1207, 23 USPQ2d 1284, 1288 (Fed.Cir.1992), cert. denied, 113 S.Ct. 976 (1993). Substantial evidence is such relevant evidence, considering the record as a whole, on which a reasonable jury might base the verdict under review. Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893, 221 USPQ 669, 673 (Fed.Cir.), cert. denied, 469 U.S. 857 (1984). Substantial evidence, however, constitutes more than a "mere scintilla." Biodex Corp. v. Loredan Biomedical, Inc., 946 F.2d 850, 859, 20 USPQ2d 1252, 1259 (Fed.Cir.1991) (quoting Consolidated Edison Co. v. National Labor Relations Bd., 305 U.S. 197, 229 (1938)), cert. denied, 112 S.Ct. 2957 (1992).
 
 
 11
 After full review of the record, we conclude that the district court erred in failing to grant Ogilvie's renewed motion for JMOL on the Lanham Act and state law tort claims, but that we cannot disturb the judgment on invalidity and noninfringement.
 
 III
 
 12
 Ogilvie makes several arguments on appeal regarding the jury's findings of invalidity of both patents. Ogilvie argues that claims 24-27 of the '725 patent were not anticipated under 35 U.S.C. Sec. 102 (1988) because the pertinent prior art reference, a paper published by Yamazaki, (i) lacked utility and did not demonstrate a reduction to practice of the disclosed subject matter; (ii) related to subject matter other than that defined in claims 24-27; and (iii) was not enabling to one of ordinary skill in the art.
 
 
 13
 Ogilvie also argues that Manildra failed to demonstrate that all claims at issue would have been obvious under 35 U.S.C. Sec. 103 (1988) in light of the prior art proffered at trial. Ogilvie's various arguments include (i) the classified wheat sample produced at trial and testimony on prior efforts to classify wheat starch do not constitute prior art for use in the obviousness analysis; (ii) Yamazaki's paper did not provide sufficient information for a person of ordinary skill in the art to discern a solution to the problem of classifying LGWS; (iii) in light of the testimony on the degree of skill corresponding to "ordinary skill in the art," (a) U.S. Patent No. 2,642,185 (Fontein)[7] would not have rendered the '718 and '725 patents' claims obvious because it does not disclose every limitation present in the claims and does not disclose an apparatus capable of producing LGWS satisfying the claims' range criteria; and (b) British Patent No. 1,252,858 (NCR)[8] would not have rendered the '718 claims obvious because, inter alia, the specification allegedly discourages any modification of natural starch for use in CCP.
 
 
 14
 Ogilvie also argues that 35 U.S.C. Sec. 112 (1988) cannot provide a basis for sustaining the jury's verdict. Finally, Ogilvie argues that it is entitled to a new trial on validity of both patents because the trial court erroneously permitted Yamazaki's testimony on subject matter not explicitly contained within his written document.
 
 
 15
 In reviewing a jury's verdict concerning patent validity, we presume the jury made the proper findings to support its verdict. Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 619, 225 USPQ 634, 637 (Fed.Cir.), cert. dismissed, 474 U.S. 976 (1985). The record before us and Ogilvie's arguments provide us with an insufficient basis on which to upset the jury's verdict on invalidity of all the claims in issue. Accordingly, the district court did not err in refusing to grant Ogilvie's renewed motion for JMOL on validity of the claims in issue. We also conclude that the district court did not abuse its discretion in refusing to grant a new trial on the issue of validity of the patent claims in issue. See Railroad Dynamics, Inc. v. A. Stucki Co., 727 F.2d 1506, 1512, 220 USPQ 929, 936 (Fed.Cir.) (reviewed district court's denial of motion for new trial for abuse of discretion), cert. denied, 469 U.S. 871 (1984).
 
 IV
 
 16
 Determining whether a patent is infringed in a particular case requires a two-part analysis. First, the claims must be interpreted without regard to the accused manufacture or process in light of the specification, the prosecution history, the patent's other claims and, if necessary, extrinsic evidence such as expert testimony. Hormone Research Found., Inc. v. Genentech, Inc., 904 F.2d 1558, 1562, 15 USPQ2d 1039, 1043 (Fed.Cir.1990), cert. dismissed, 111 S.Ct. 1434 (1991). Claim interpretation is a question of law that this court reviews de novo. Key Mfg. Group, Inc. v. Microdot, Inc., 925 F.2d 1444, 1448, 17 USPQ2d 1806, 1809 (Fed.Cir.1991). Second, the fact-finder must determine whether each properly interpreted claim "reads on" the accused structure or process to determine whether the accused matter incorporates each claim limitation, either literally or by its equivalent. Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1570, 24 USPQ2d 1321, 1330 (Fed.Cir.1992). Such infringement determinations are questions of fact. SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1125, 227 USPQ 577, 589 (Fed.Cir.1985) (in banc). Finally, it is not our function as an appellate court to substitute our judgment for that of the jury and determine for ourselves whether we would have concluded that the product infringes the claims, but rather whether there is sufficient evidence to support a jury verdict on the issue. Dana Corp. v. IPC Ltd. Partnership, 860 F.2d 415, 417, 8 USPQ2d 1692, 1694 (Fed.Cir.1988), cert. denied, 490 U.S. 1067 (1989); Perkin-Elmer, 732 F.2d at 893, 221 USPQ at 673.
 
 
 17
 * Regarding interpretation of the claims in issue, Ogilvie argues that the claim language "about 22% of the total number of granules ... being at least 22 microns" should be read to encompass a product with 22% by number of granules having a diameter of at least 17 microns. Likewise, Ogilvie argues that the language "about 99% by weight of the granules are at least 12 microns in size" should be read to embrace LGWS with at least 95% by weight of granules having a diameter of at least 12 microns. Ogilvie supports its arguments by reasoning that because the standard size of the dye microcapsules to be protected by the stilting material has decreased in the CCP industry, as has the corresponding requisite size of the stilting material particles, the claim limitations setting forth the requisite size limitations should be adjusted accordingly. We find these arguments unpersuasive.
 
 
 18
 The claims of a patent delineate the metes and bounds of the patentee's right to exclude others from making, using or selling. Palumbo v. Don-Joy Co., 762 F.2d 969, 974, 226 USPQ 5, 8 (Fed.Cir.1985); 35 U.S.C. Sec. 154 (1988). A familiar canon of claim construction is that while a patentee may be his own lexicographer, a word will be given its ordinary and accustomed meaning unless it appears that the inventor used it differently. ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1580, 6 USPQ2d 1557, 1560 (Fed.Cir.1988). In this case, Ogilvie's patents do not claim a particle size that would require interpretation, such as "a granule of a size substantially larger than the size of the dye microcapsule to be protected." Instead, they specifically and unambiguously delineate numerical ranges of granule size and quanta. We thus interpret the claims exactly as they are written.
 
 B
 
 19
 In order to infringe a patent claim literally, each and every limitation in the claim must actually be present in the accused structure or process. Hi-Life Prods., Inc. v. American Nat'l Water-Mattress Corp., 842 F.2d 323, 325, 6 USPQ2d 1132, 1133 (Fed.Cir.1988). Failure to meet a single limitation is sufficient to negate an allegation of infringement of the claim. Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1535, 19 USPQ2d 1367, 1369 (Fed.Cir.1991).
 
 
 20
 Ogilvie argues repeatedly that the evidence presented at trial demonstrates that Manildra's M-80 product has 97% by weight of particles greater than 12 microns in size and 22% by number greater than 20 microns in size, and therefore M-80 infringes the '718 and '725 patents. Ogilvie's literal infringement argument depends on its construction and interpretation of the claims in issue. Our rejection of Ogilvie's interpretations necessarily requires us to conclude that the claims as properly interpreted are not literally infringed. Moreover, although M-80 data were presented at trial that would have supported a finding of infringement of the claims' granule size and quanta limitations, there was also more than substantial evidence for the jury to have concluded otherwise, as it did.
 
 
 21
 Ogilvie also argues that Manildra's process[9] literally infringes claims 16-19 of the '725 patent because essentially all of the classification of the wheat starch occurring in Manildra's process occurs in the two hydrocyclones before the air classifier, and therefore the air classifier is simply superfluous and a bald subterfuge for avoiding infringement. Although there is evidence to the contrary, the evidence supporting the jury's verdict on this issue is substantial and therefore legally sufficient to prevent our disturbing the jury's findings of fact on this issue.
 
 C
 
 22
 Ogilvie argues that even if the evidence does not demonstrate literal infringement, it "is absolutely evident" that Manildra's product infringes under the doctrine of equivalents because "the Manildra stilt is so nearly identical to the Patents' [numerical] limitations." Thus, according to Ogilvie, the district court erred in failing to grant its renewed motion for JMOL. While this argument is facially appealing since the evidence before the jury demonstrated that Manildra's product came close to satisfying the claims' numerical limitations, Ogilvie is precluded as a matter of law from prevailing on its contention.
 
 
 23
 Prosecution history estoppel is a policy-oriented limitation on the range of equivalents available to the patentee. Loctite Corp. v. Ultraseal, Ltd., 781 F.2d 861, 870, 228 USPQ 90, 96 (Fed.Cir.1985). Prosecution history estoppel will not allow the patentee to extend the range of equivalents accorded the subject matter to that relinquished during patent prosecution. Id., 228 USPQ at 96. The range of equivalents available to the patentee is a question of law which we review de novo. Id., 228 USPQ at 96.
 
 
 24
 During prosecution of both the '718 and '725 patents, the applicants, inter alia, specifically represented to the Patent Office that size limitations were "critical to [the] utility" and therefore the patentability of the claimed subject matter. For example, during prosecution of the application that ultimately spawned the '718 patent, the applicants stated:
 
 
 25
 Applicants urge [the] critical limit[ation] of [greater than] 22% of [greater than or equal to] 22 microns in size.
 
 
 26
 * * *
 
 
 27
 * * *
 
 
 28
 [T]he particle size range of the starch fraction used on the surface coated with rupturable micro-capsules is of critical importance to prevent premature rupturing of the micro-capsules during handling.
 
 
 29
 Ogilvie argues that because these limitations were not added to the claims as part of an amendment in response to a rejection, it cannot be prevented from expanding its right to exclude to encompass Manildra's product. It has long been held, however, that an estoppel is created merely by arguments submitted to obtain the patent, as well as traditionally by an applicant's conduct reactive to an examiner's rejection. E.g., Hughes Aircraft Co. v. United States, 717 F.2d 1351, 1362, 219 USPQ 473, 481 (Fed.Cir.1983).
 
 
 30
 Having stressed the criticality of the substantive size and quanta limitations of the LGWS, Ogilvie cannot now escape the accompanying strictures on its right to exclude under 35 U.S.C. Secs. 154, 271 (1988). Our review of the record and arguments presented on appeal convinces us that the jury verdict of noninfringement under the doctrine of equivalents cannot be disturbed.
 
 
 31
 Ogilvie likewise argues that Manildra's process infringes its patent under the doctrine of equivalents. After reviewing the record, however, we are convinced that there was substantial evidence before the jury to support a conclusion that the air classifier in fact plays an integral and important role in Manildra's production of LGWS, and therefore the jury's implicit finding that the accused process does not infringe under the doctrine of equivalents because the process achieves production of LGWS in a substantially different way.
 
 D
 
 32
 In conclusion, and on the record before us, we are unable to find any basis on which to disturb the jury's verdict on infringement of the claims in issue of the '718 and '725 patents. As the district court stated in correctly denying Ogilvie's renewed motion for JMOL on infringement:
 
 
 33
 [T]he court finds that much evidence was presented on this issue both supporting a finding of infringement and supporting a conclusion of non-infringement. The jury chose to believe the evidence supporting non-infringement. This court cannot say as a matter of law, considering all inferences in the favor of the nonmoving party, that Ogilvie was entitled to a judgment on the issue of infringement.
 
 
 34
 Manildra Milling Corp. v. Ogilvie Mills, Inc., 797 F.Supp. 874, 886 (D.Kan.1992).
 
 
 35
 Since we conclude that we cannot upset the jury's verdict of noninfringement, we need not reach the issues of Manildra's alleged inducement to infringe or its alleged willful infringement, since both allegations rely on a predicate finding of actual infringement, whether literal or by equivalents. See Water Technologies Corp. v. Calco, Ltd., 850 F.2d 660, 668 n. 7, 7 USPQ2d 1097, 1103 n. 7 (Fed.Cir.), cert. denied, 488 U.S. 968 (1988).
 
 
 36
 Finally, Ogilvie also appeals the trial court's denial of its motion for a new trial on infringement. Ogilvie makes a variety of evidentiary arguments in an attempt to demonstrate that the court abused its discretion in denying the motion. Those arguments only demonstrate that, with regard to infringement, there is some evidence to support Ogilvie's contention. Ogilvie, however, has failed to demonstrate that the district court abused its discretion in refusing to grant a new trial on infringement of the patent claims in issue.
 
 V
 
 37
 There are three separate causes of action at issue under which Ogilvie was found liable: section 43(a) of the Lanham Act[10] and the Kansas law causes of action for tortious interference with prospective economic advantage[11] and injurious falsehood.[12] This court has jurisdiction to review both the Lanham Act and state law issues. See 28 U.S.C. Secs. 1295(a)(1), 1338 (1988). Not having exclusive jurisdiction over these types of claims, however, we apply Tenth Circuit law to the Lanham Act claim, see, e.g., Jurgens v. McKasy, 927 F.2d 1552, 1564, 18 USPQ2d 1031, 1039 (Fed.Cir.), cert. denied, 112 S.Ct. 281 (1991), and Kansas law to the state tort actions. Again, the issue before us is whether the record includes evidence legally sufficient in quantum to support the jury's verdicts on each cause of action. For the purpose of reviewing the jury's verdicts in this case, we focus on the common thread of each of the causes of action--namely, that all three require either falsity, whether literal or simply deceptive or misleading,[13] or misconduct[14] ("wrongful" elements).
 
 
 38
 A basic premise of any cause of action is that the party on whom the burden of proof initially rests, typically the complainant, must establish a prima facie case by introducing evidence on each and every element of the cause of action. 29 Am.Jur.2d Evidence Secs. 123, 128-129 (1967). Failure to present evidence on even one necessary element is fatal to the complainant's case as a matter of law.
 
 
 39
 Manildra argues in this overly adversarial portion of the appeal that Ogilvie's patent "litany" constituted a series of misrepresentations to their mutual customers that Manildra was infringing the patents in suit and therefore the customers acted at their own risk in purchasing the infringing product. According to Manildra, this "litany" satisfies the "wrongful" elements and therefore provides a sufficient basis on which to find Ogilvie liable. Manildra's argument is premised on the alleged statements being false as a matter of fact because the jury found Manildra not to be infringing either patent:
 
 
 40
 There was abundant evidence in the record that Ogilvie intentionally, knowingly and in bad faith made false claims that Manildra infringed the patents, and that those statements induced [the LGWS purchasers] to limit their purchases from Manildra.
 
 
 41
 At oral argument, Manildra also emphasized Ogilvie's alleged representations to its customers that its patents dominated the field of LGWS and thus any use of LGWS from an entity other than Ogilvie or its licensees would infringe and would embroil the infringer in litigation. Manildra argues that the reaction of their customers in refusing to buy from Manildra "simply because of the legal situation" confirms Manildra's view of the case.
 
 
 42
 Contrary to Manildra's position, however, is our conviction that the record in this case does not contain evidence sufficient to establish the critical "wrongful" elements. Moreover, the record fails to establish both the composition of the "litany" and how the "litany" renders Ogilvie liable under the state laws and the Lanham Act. In support of its argument, Manildra lists exhibit after exhibit which purportedly corroborate its position. Yet after examining the entire record on appeal, we have discovered only one document, referred to as P715, out of several thousand trial exhibits, that provides some evidence that Ogilvie without qualification stated that Manildra was infringing its patents. Moreover, this single document is not a direct communication between Ogilvie and one of its customers, but rather is an internal customer memorandum between two of the customer's employees regarding future LGWS purchases and a future expansion of business, in which context the memorandum summarizes Ogilvie's statements. The other exhibits simply do not support the proposition for which they are cited. Furthermore, out of over fifteen thousand pages of transcript, no testimony directly bears on Ogilvie's falsity/misconduct.[15]
 
 
 43
 This court has also discovered no evidence, and was not directed to any by the parties, that supports Manildra's "domination" argument. As conceded by Manildra, we cannot consider Henkel's conduct and statements in this regard. In fact, once the evidence of Henkel's conduct is excised from this appeal, Manildra's whole case on the Lanham Act and state law tort claims disintegrates.
 
 
 44
 At oral argument, Manildra was exhorted to underscore the evidence on which it based its allegations and on which a reasonable jury could have based its verdict. Manildra could only respond with the documents already examined by this court and rely on "inferences" that "have to [be drawn]" by this court.
 
 
 45
 Since substantial evidence requires more than a "mere scintilla" of evidence, Biodex Corp., 946 F.2d at 859, 20 USPQ2d at 1259, we conclude on this record that a reasonable jury could not have found Ogilvie liable to Manildra under the Lanham Act and the state law causes of action because the evidence on the "wrongful" elements of those claims constitutes at most a "mere scintilla."
 
 
 46
 Since we conclude that the record fails to establish conduct on Ogilvie's part that would qualify for liability under the Lanham Act, we need not decide whether the Lanham Act should even come into play in the situation where a patentee is publicizing the presumed validity of its patents and belief in a competitor's infringement thereof. See, e.g., Tubeco, Inc. v. Crippen Pipe Fabrication Corp., 402 F.Supp. 838, 847, 187 USPQ 746, 752 (E.D.N.Y.1975) (communications to customers and prospective licensees regarding patent are "in no sense the false advertising at which the Lanham Act was aimed."), aff'd, 538 F.2d 314 (2d Cir.1976) (table); cf. Lang v. Pacific Marine & Supply Co., 703 F.Supp. 1404, 1411, 10 USPQ2d 1058, 1063 (D.Haw.1989) (section 43(a) is intended to reach false advertising violations, not false patent claims), aff'd, 895 F.2d 761, 13 USPQ2d 1820 (Fed.Cir.1990); compare with Brandt Consol., Inc. v. Agrimar Corp., 801 F.Supp. 164, 174, 24 USPQ2d 1341, 1348-49 (C.D.Ill.1992) (citing Chromium Indus., Inc. v. Mirror Polishing & Plating Co., 448 F.Supp. 544, 555, 199 USPQ 146, 159 (N.D.Ill.1978) (false statements that competitor infringes a patent states a section 43(a) violation)).
 
 
 47
 Likewise, we also have no reason to address Ogilvie's argument that it is shielded from liability as a matter of law because it is entitled under the federal patent laws to assert both the validity of its patents and Manildra's infringement. We thus leave for another day resolution of any existing tension between, and the accompanying limitations on, the right of a patentee under the federal patent laws to announce a competitor's suspected infringement of its patents to the marketplace and the states' laws of "unfair competition." See, e.g., Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 152 (1989) (an entity cannot be liable under state law for conduct that is permitted by federal law); Loctite Corp., 781 F.2d at 877, 228 USPQ at 100-01 (following Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986, 202 USPQ 342 (9th Cir.1979), cert. denied, 444 U.S. 1025 (1980)) (patentee must be able to engage in legitimate enforcement efforts to protect its rights in the face of potential infringement).
 
 
 48
 At this time, we also need not address the influence of the First Amendment's protection of freedom of speech in the commercial context and the role of a competitor's qualified privilege on any existing tension between federal and state laws. See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 765 (1976) (dissemination and free flow of commercial information in free enterprise economy is indispensable).
 
 VI
 
 49
 Because we conclude that the record does not support Ogilvie's alleged violation of section 43(a) of the Lanham Act and therefore reverse the judgment on this ground, we also reverse the district court's award of attorney fees based on 15 U.S.C. Sec. 1117(a). To the extent that the case was found "exceptional" under 35 U.S.C. Sec. 285, however, we vacate the determination and remand for reconsideration of the issue in light of this opinion.
 
 VII
 
 50
 The district court denied Ogilvie's motion to correct inventorship on the '718 and '725 patents, and U.S. Patent No. 3,951,948 ('948 patent) not otherwise at issue in this case. Ogilvie argues that the district court abused its discretion in denying its motion after finding that the error in failing to name all of the inventors in each patent resulted from inadvertent oversight without any deceptive intention, as required by 35 U.S.C. Sec. 256. Manildra Milling Corp. v. Ogilvie Mills, Inc., 745 F.Supp. 653, 655, 19 USPQ2d 1186, 1187-89 (D.Kan.1990) (ruling on motion deferred until after trial); Manildra Milling, 797 F.Supp. at 889-90. As to the claims-in-issue of the '718 and '725 patents, the district court denied Ogilvie's motion as moot since the claims had been held invalid. Ogilvie has not demonstrated that this action constituted an abuse of the court's discretion in this matter. The district court, however, did not otherwise explicitly address Ogilvie's motion. Thus, on remand, Ogilvie will have the opportunity to renew its motion to correct inventorship under section 256 as to the remaining, unadjudicated claims of the '718 and '725 patents as well as to the '948 patent.
 
 VIII
 
 51
 Manildra cross-appeals the trial court's denial of its motion for a new trial on its antitrust claims. Manildra argues that the court incorrectly instructed the jury on the "double hurdle" nature of an antitrust claim and on how the evidence of Henkel's past conduct could be used. Having reviewed the arguments, we find that the court did not abuse its discretion in denying a new trial on this issue.
 
 IX
 
 52
 For the foregoing reasons, the judgment of the United States District Court for the District of Kansas based on the jury verdict of invalidity and noninfringement is affirmed; the judgment on the Lanham Act and state law claims for tortious interference and injurious falsehood, and the accompanying award of compensatory and punitive damages, are reversed; and the award of attorney fees is vacated for reconsideration.
 
 
 53
 Each party is to bear its own costs.
 
 ON PETITION FOR REHEARING
 
 54
 Sept. 20, 1993.
 
 ORDER
 
 55
 Both Manildra Milling Corporation (Manildra) and Ogilvie Mills, Inc. (Ogilvie) petition for rehearing of the appeal, decided on June 22, 1993 by the Court's opinion and judgment. The Court having considered the petitions,
 
 IT IS ORDERED THAT:
 
 56
 Ogilvie's petition is denied. Manildra's petition is granted solely for the purpose of revising the Court's opinion as hereinafter provided:
 
 
 
 [1]
 Manildra Milling Corp. v. Ogilvie Mills, Inc., No. 86-2457-S (D.Kan. Feb. 27, 1992) (Judgment); (June 15, 1992) (amended Judgment); 797 F.Supp. 874 (D.Kan.1992) (memorandum and order disposing of various post-trial motions); (June 16, 1992) (order)
 
 
 [2]
 CCP functions by forming an image on the lower sheet of CCP when pressure on the upper sheet breaks easily rupturable dye microcapsules on the backside of the upper sheet, causing the dye to contact and darken a chemical on the upper surface of the lower sheet
 
 
 [3]
 Simply stated, the patented process comprises, inter alia, the steps of feeding a clean starch slurry to a first hydrocyclone; feeding the resulting bottoms stream of partially classified LGWS to a second hydrocyclone; and producing LGWS meeting certain specifications as a bottoms stream from the second hydrocyclone
 
 
 [4]
 Manildra settled with Henkel in January 1991, before the trial phase of the suit commenced
 
 
 [5]
 The first trial to a jury resulted in a mistrial. The second jury trial resulted in the present appeal
 
 
 [6]
 Manildra's motion to strike certain portions of Ogilvie's reply brief on appeal is denied
 
 
 [7]
 Fontein discloses a method for refining and isolating starch granules below 7 microns in diameter. Two hydrocyclones are operated in series, with the overhead fine particle stream from the first hydrocyclone used as a feed stream for the second
 
 
 [8]
 NCR discloses use of large granule starch as a stilting material in CCP, and discusses various sources of starch for such use, including arrowroot and wheat
 
 
 [9]
 Manildra's process for producing LGWS incorporates use of two hydrocyclones to "wash" the wheat starch feed and an air classifier which receives the washed starch stream, after drying, as feed and produces the LGWS product
 
 
 [10]
 Section 43(a) of the Lanham Act reads:
 Any person who, on or in connection with any goods ..., uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which--
 * * *
 (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of ... another person's goods, services, or commercial activities,
 shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
 15 U.S.C. Sec. 1125(a) (1988) (emphasis added).
 
 
 [11]
 Tortious interference with prospective economic advantage under Kansas law consists of the following elements: (i) existence of a business relationship or an expectancy with a probability of future economic benefit to the plaintiff; (ii) defendant's knowledge of the relationship or expectancy; (iii) that, except for the defendant's conduct, the plaintiff was reasonably certain to have continued the relationship or to have realized the expectancy; (iv) intentional misconduct by the defendant; and (v) damages suffered by the plaintiff as a direct or proximate cause of the defendant's misconduct. Reazin v. Blue Cross & Blue Shield, Inc., 899 F.2d 951, 977 (10th Cir.) (emphasis added), cert. denied, 497 U.S. 1005 (1990)
 
 
 [12]
 Under Kansas law,
 [o]ne who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
 (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and
 (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.
 Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 892-93 (10th Cir.1991) (citing Restatement (Second) of Torts Sec. 623A (1979) (emphasis added)).
 
 
 [13]
 See Charles E. McKenney & George F. Long, III, Federal Unfair Competition: Lanham Act Sec. 43(a) Sec. 6.03, at 6-14 to -15 (1991)
 
 
 [14]
 Whether certain conduct is "misconduct" is determined by considering the factors listed in Restatement (Second) of Torts Sec. 767 (1979). Reazin, 899 F.2d at 977 n. 37; see also Turner v. Halliburton Co., 722 P.2d 1106, 1116-17 (Kan.1986);
 
 
 [15]
 Manildra concedes that Henkel's past conduct and statements regarding Manildra's infringement should not be taken into account as direct evidence of the "wrongful" elements in determining the substantial evidence issue regarding Ogilvie's liability. Manildra argues, however, that the evidence of Henkel's conduct can be used to infer Ogilvie's conduct because Ogilvie continued to employ some of Henkel's salespersons who had, while in Henkel's employ, represented Manildra's conduct as infringing. Since Henkel and Ogilvie are unaffiliated legal entities, there is no justification for attributing Henkel's actions to Ogilvie absent some evidence of an adoption of Henkel's policies. Since the record lacks any such evidence, Manildra's position is untenable. Moreover, the jury was instructed that Henkel's conduct, occurring before Ogilvie's creation, could not be considered in determining whether Manildra had carried its burden of proof in demonstrating all the elements of its state law and Lanham Act claims. This instruction is not challenged by the parties on appeal